■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY CARTER, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Queens County (Farlo, J.), rendered February 4, 1983, convicting him of robbery in the first degree (three counts), robbery in the second degree (three counts), and assault in the first degree, upon a jury verdict, and imposing sentence.

Judgment affirmed.

Defendant was found guilty of acting in concert with another on April 27, 1982, at about 6:30 to 6:45 P.M., in an armed robbery at a service station in Queens. The facts, as relevant to this appeal, are as follows: Linton Pommells, the owner of the service station, was in the office area speaking with Jasper Ashley and Sonya Cascoe, two customers. Pommells looked out the window and noticed that two men who had been standing across the street had crossed over and were approaching the office area. One of them, the defendant, entered the office carrying a tool box. He walked up in between Pommells and Ashley, opened the box, and pulled out a gun. He said "This is a stick-up, where is the money? This is no joke" and then entered a separate private office area. At that point, the second man entered, and Pommells stood up and said "what is going on here". The man immediately pulled out a gun and shot him. Both defendant and his cohort took money or jewelry from their three hostages at gunpoint, and defendant took the wallet and a pack of cigarettes out of Pommells' pocket as he lay on the ground bleeding. The two men were in the store for a total of 15 to 20 minutes before they finally left. Pommells was taken to the hospital, where he remained until May 22, 1982. While in the hospital, Pommells was twice shown a photographic array by the police. Both times he identified defendant's picture.

The same photographic array was shown to Jasper Ashley on the night the incident had occurred. Ashley also picked defendant's picture out of the photo array. Ashley also picked defendant's picture a few days later when he was again shown the same photographs by the police.

On May 27, 1982, Ashley and Cascoe were both called to the station house and separately viewed a lineup. Cascoe was unable to make an identification. Ashley then viewed the lineup and similarly made no identification when the investigating detective asked if he recognized the perpetrator. However, Ashley testified that as he walked out of the room from which he viewed the lineup, he realized that while the individual who fired the gun was not in the lineup, the other one, defendant, was indeed one of the people in the lineup. At the trial, conflicting testimony was presented as to how this fact came to the

attention of the detective. Ashley testified that he called the detective over and told him that he recognized defendant. The detective, who was called as a witness for the defense, testified that he did not recall whether he initiated that conversation, or whether it was Ashley who first approached him. At the *Wade* hearing, the detective had testified that after the first lineup, he said to Ashley "didn't you recognize anybody in there?" and Ashley said that he recognized defendant. At the trial, the detective was asked to refresh his recollection by reading his testimony from the *Wade* hearing. After so doing, the detective explained that the conversation had been spontaneous on both his and Ashley's part, and they they both approached each other at the same time. The trial court denied defendant's request to have that portion of the detective's *Wade* hearing testimony read to the jury.

As part of the conversation after the first lineup, Ashley told the detective that he did not see the one that did the shooting, but that the other one who took his property was on the far right. When the detective asked him why he did not say so before, Ashley responded that he was nervous, confused, and was looking for the one that did the shooting.

The people in the lineup were then rearranged, their clothing and positions were changed, and defendant was permitted to choose the number and position which he wanted. Upon viewing this second lineup, Ashley immediately identified defendant. The detective asked Ashley from where he recognized defendant and Ashley said from the gas station. After a *Wade* hearing, the court, *inter alia,* denied that branch of defendant's motion which sought to suppress Ashley's lineup identification, finding that there was no improper police conduct, and that Ashley's explanation that he was looking for the person who shot Pommells, rather than the other perpetrator, was credible and understandable. The court also found an independent basis for Ashley's in-court identification based upon his opportunity to observe defendant for 15 to 20 minutes at the time of the crime.

Following the *Wade* hearing, but prior to trial, defendant made a *Sandoval* motion to suppress his rather lengthy history of criminal offenses. The court granted the motion, in part, and suppressed all of the prior offenses with the exception of one offense for which he was adjudicated a youthful offender and sentenced to 30 days' incarceration.

Defendant did not testify at the trial, but did present an alibi defense which consisted of three witnesses' testimony on his behalf. Defendant's girlfriend testified that she and defendant were at his house the afternoon of the crime. They left together

some time between 5:30 and 6:00 P.M. to walk to her house, some 25 blocks away. The mother of defendant's girlfriend testified that defendant and her daughter arrived at her house sometime between 6:00 and 6:45 P.M. and did not leave until the next morning. Defendant's mother testified that her son and his girlfriend left her house that evening between 6:30 and 6:45 P.M. None of these alibi witnesses was positive of any time periods during that day except for the specific time in which it was necessary to account for defendant's whereabouts. There were, in addition, some contradictions among the testimony of these three witnesses.

At the conclusion of the trial, defendant was found guilty of three counts of robbery in the first degree, three counts of robbery in the second degree, and one count of assault in the first degree. On appeal, defendant challenges, *inter alia,* the denial of that branch of his motion which sought to suppress Ashley's identification, the court's refusal to permit defense counsel to utilize minutes of the *Wade* hearing to impeach the detective's testimony, and the court's ruling on his *Sandoval* motion. We now affirm defendant's conviction.

Criminal Term did not abuse its discretion by preventing defense counsel from reading the detective's *Wade* hearing testimony to the jury. That testimony concerned a collateral matter as it was being used only to attack the credibility of Ashley, who testified that it was he who started the conversation. Furthermore, the detective, who was a defense witness, freely answered all questions asked, and thus, there was no basis upon which to permit the defense to impeach its own witness. In any event, we find that the testimony of the *Wade* hearing can be reconciled with the trial testimony, when read as a whole. At the trial, the detective openly admitted that he asked Ashley why he did not point defendant out in the first lineup. He merely added that he was not sure who started speaking first. The *Wade* hearing testimony can be read as indicating that the detective did not precipitate the entire conversation, but rather, had precipitated that part which concerned the reasons why Ashley did not initially identify defendant. As such, the detective's testimony at the trial was not inconsistent with his testimony at the *Wade* hearing; it was just more specific and detailed. As we cannot say that the testimony was inconsistent, we decline to find that Criminal Term abused its discretion by preventing the defense from reading the minutes to the jury (see CPL 60.35).

Neither do we find any error in the denial of that part of the motion which sought to suppress Ashley's identification of defendant, both in court and at the lineup. The fact that Ashley

viewed two photographic arrays prior to picking defendant out of the lineup did not taint the subsequent identifications. We note that a few weeks had passed in between the time that Ashley viewed the second photographic array and the time that the lineup identification was made. In addition, the photograph which Ashley identified was admitted into evidence for the jury's observation. Under the circumstances of this case, we find that there was no improper police conduct and the identification procedures utilized, both in connection with the photographic arrays and with the lineups, were not unduly suggestive (see *People v Van Buren,* 87 AD2d 900).

In any event, the record discloses an ample basis for the court's conclusion that Ashley possessed an independent basis for the identification. He observed defendant at the time of the crime, for a period of over 15 minutes, in a well-lit room. In addition, right after the incident, he gave the police a detailed description of both defendant and his cohort. We conclude that it was proper to permit Ashley to identify defendant in court.

As to the decision on defendant's *Sandoval* motion, we find that the court properly exercised its discretion in ruling that the prosecution could cross-examine defendant about one of his prior offenses, if he chose to testify at the trial. Defendant did not meet his burden of showing that any probative value in assessing his credibility from the admission of this prior offense would be outweighed by the possible prejudice (see *People v Sandoval,* 34 NY2d 371; *People v Rahman,* 46 NY2d 882). In any event, we find that this ruling did not prevent defendant from presenting his case to the jury, as he had three alibi witnesses who testified in his behalf (see *People v Hall,* 99 AD2d 843).

The other contentions raised by defendant have been examined and are found to be without merit. Weinstein, J. P., Brown, Boyers and Eiber, JJ., concur.