Rodolfo TAYLOR, Petitioner,

v.

Robert KUHLMANN, Superintendent, Sullivan Correctional Facility; Dennis Vacco, Attorney General, the State of New York, Respondents.

No. CV 94–2218 ADS.

United States District Court,
E.D. New York.

Feb. 22, 1999.

536

537

Rodolfo Taylor, Beacon, New York, petitioner pro se.

Office of the Suffolk County District Attorney, Riverhead, New York, by Guy Arcidiacono, Assistant District Attorney, of counsel, for the respondents.

Rodolfo Taylor, Beacon, NY, pro se.

Office of Suffolk County Dist. Atty. (Guy Arcidacono, Asst. Dist. Atty., of Counsel), Riverhead, NY, for Respondents.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The habeas corpus petitioner, Rodolfo Taylor, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he claimed the following six grounds for relief: (1) he was denied the right to counsel during a series of lineups; (2) the witnesses identifications of him were the product of unduly suggestive lineups; (3) the trial court committed two evidentiary errors during the pre-trial *Wade/Dunaway* suppression hearing when it precluded defense counsel from establishing the exact time of petitioner's arrest and how the lineup participants were selected; (4) the trial court erred by entering a conviction under Indictment Number 1135–84 for Robbery in the First Degree rather than Robbery in the

Second Degree; (5) he was illegally arrested at his home in violation of his Fourth Amendment rights; and (6) he was denied the effective assistance of counsel at trial.

In a Report and Recommendation dated November 13, 1997, United States Magistrate Judge Arlene R. Lindsay recommended that Taylor's petition be denied in its entirety. This Court granted Taylor an extension of time to object to the Report. He filed an initial objection on September 11, 1998 and a supplemental objection on October 16, 1998. By a letter to the Court dated December 9, 1998, respondent's counsel indicated that he was not filing any objections to the Magistrate Judge's Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), any party may file written objections to the Report and Recommendation of the Magistrate Judge. *See also* Fed.R.Civ.P. 72(a). Where, as here, objections have been filed, the district court is required to make a *de novo* determination as to those portions of the Report and Recommendation to which objections were made. *See* 28 U.S.C. § 636(b)(1); *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir. 1989).

The Court has carefully reviewed Judge Lindsay's thoughtful, detailed and thorough Report and Recommendation, as well as the petitioner's submissions and objections, and concurs with Judge Lindsay's recommendations for the reasons set-forth in her well-reasoned Report.

Accordingly, it is hereby

**ORDERED,** that the Court adopts the Report of United States Magistrate Judge Arlene R. Lindsay, dated November 13, 1997, recommending that Taylor's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be dismissed; and it is further

**ORDERED,** that Taylor's petition for a writ of habeas corpus is dismissed in its entirety; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

*REPORT & RECOMMENDATION*

LINDSAY, United States Magistrate Judge.

The district court has referred Rodolfo Taylor's ("Petitioner's" or "Taylor's") habeas corpus petition, filed pursuant to 28 U.S.C. § 2254, to the undersigned for a report recommending whether habeas relief is warranted. In his *pro se* petition, Taylor challenges two convictions entered after two separate jury trials in the County Court of the State of New York, Suffolk County, for three counts of robbery in the first degree. (New York Penal Law § 160.15). A judgment of conviction for two counts of robbery in the first degree was entered on September 3, 1985 under Indictment No. 1355–84, and a judgment of conviction for one count of robbery in the first degree was entered on October 31, 1985, under Indictment No. 1185–84, as amended on November 1, 1985. Petitioner was sentenced to two indeterminate terms of incarceration of nine to eighteen years on each indictment to be served consecutively.

Taylor has raised the following grounds in support of his petition: (1) that he was entitled to have an attorney present at the time he appeared in a series of lineups and, the failure to provide him with counsel violated his constitutional rights; (2) that the lineups were unduly suggestive; (3) that the trial court committed reversible error with respect to two evidentiary rulings during the *Wade/Dunaway* hearing when it precluded defense counsel from establishing the exact time of petitioner's arrest and how the lineup participants were chosen; (4) that the trial court committed reversible error by entering a conviction under Indictment No. 1135–84 for robbery in the first degree rather than robbery in the second degree; (5) that he was illegally arrested at his home in violation of his fourth amendment rights and, therefore, the lineup identifications obtained as a result of the illegal arrest should have been suppressed; and (6) that his trial counsel's assistance was ineffective because counsel failed to move for suppression of the lineup identifications as a product of his illegal arrest. For the following reasons, it is RECOMMENDED that the district court deny Taylor's petition.

## I. BACKGROUND

### A. Photo spread-Arrest:

Prior to July 1984, Detective Robert Anderson of the Third Precinct of the Suffolk County Police Department had been assigned to investigate a series of gas station robberies including the robbery of a Texaco station located at Motor Parkway and the Long Island Expressway in Brentwood, New York ("the Texaco robbery") which occurred on February 22, 1984, and two robberies of a Shell gas station located at Route 111 and Spur Drive in Central Islip, New York, which occurred on June 2nd and again on June 10, 1984.[1] (T. 10–11, 77–80). Harold Bailey had been working as an attendant at the Shell station on June 10th and had witnessed that robbery. (T. 15). On July 1, 1984, Detective Anderson asked Bailey to come to the Third Precinct to view a photo spread. (T. 13). Bailey was shown a photo spread and identified the petitioner Rodolfo Taylor as the person who committed the June 10th robbery. (T. 16). Based on Bailey's identification, Anderson told Taylor's parole Officer, Officer Houlan, that Taylor was a robbery suspect in the robberies and they discussed transporting the petitioner to the precinct to appear in a lineup. (T. 139, 140).

On July 3, 1984, Taylor was asked to accompany Officer Houlan and two Suffolk County police officers to the Third precinct where he appeared in a series of ten lineups. (T. 96) Five witnesses—Dennis Ford, Daniel Farrell, and Kathleen Young (the eye-witnesses of the June 2nd Shell robbery), Gary Meenahan (the victim of the February 22nd Texaco robbery) and Bailey—each viewed two separate lineups in which they all positively identified Taylor as the individual who had committed the robbery he or she had witnessed. (T. 24, 26, 39, 43, 53, 55, 64A, 65,

71, 72). Although Detective Anderson considered Taylor to be technically under arrest after each witness identified him, petitioner was not actually placed under arrest until the conclusion of the lineups. (T. 56, 74). At that time, Detective Anderson recorded his pedigree information: Taylor was 23 years old, 6'2½" tall and weighed approximately 160 pounds. (S.102).

Rodolfo Taylor was subsequently charged with two counts of robbery in the first degree under Indictment No. 1185-84 for the Texaco and June 10th Shell robberies and with two counts of robbery (robbery in the first and second degree) under Indictment No. 1355-84 for the June 2nd Shell robbery.

### B. Pre–Trial Wade/Dunaway Hearing:

On June 13 and June 17, 1985, the trial court held an extensive pre-trial Wade/Dunaway hearing on the charges contained in both indictments.[2] Taylor challenged the photo spread identification and the lineups as unduly suggestive and violative of his due process rights. (T. 8). He further challenged the failure to provide him with counsel at the lineups and raised the issue of probable cause for his arrest. Id. Detective Anderson was the only witness who testified at the hearing. He described the procedures used to conduct both the photo spread shown to Bailey and the lineups viewed by all the witnesses.

With respect to the photo spread, Detective Anderson testified that on July 1, 1984, Harold Bailey was shown a photo spread at the Third Precinct. (T. 13). Anderson had prepared a folder of photographs that had been numbered one through eight. (T. 131). Each photograph was placed behind a manila folder with a cut-out exposing only the face of a black male. (T. 14). Anderson told Bailey to look at the photographs and, if he

---

1. Numbers in parenthesis preceded by "T." refer to the page numbers of both the transcript of the *Wade/Dunaway* hearing (which concerned the charges in both indictments) and the trial transcript for Petitioner's June 1984 trial where he was tried under Indictment No. 1135-84 for the June 2nd Shell station robbery and the Texaco robbery. Numbers preceded by an "S." refer to the transcript for Petitioner's September 1984 trial where he was tried under Indictment No. 1185-84 for the June 10th Shell station robbery.

2. The indictments were originally consolidated for trial. After the pre-trial hearing but prior to the commencement of the trial, however, the court granted the prosecution's motion to sever the count for the June 10th Shell robbery due to Bailey's unavailability. (T. 174, 196). Petitioner was tried separately for this robbery on September 19, 1985.

recognized one of them as the subject who robbed him, to tell Anderson the number of the photograph. (T. 15). Bailey looked at the photographs for about a minute and identified photograph numbered "2" as the person who robbed him. This was a photograph of Rodolfo Taylor. (T. 16, 131–132). Bailey indicated that he was 100% certain of his identification, and placed his initials on the back of the photo as did Detective Anderson and Sergeant Sievers, who was also present. (T. 16–17). The photo spread was then introduced into evidence. (T. 14–15).

Detective Anderson then proceeded to describe in detail the procedures used to conduct each of the lineups in which Taylor participated on July 3, 1985. Anderson described the two lineups which were viewed by Bailey: The lineups consisted of five black males, one of whom was Rodolfo Taylor, all dressed in blue coveralls. (T. 18). Taylor was given his choice of a number and the remaining numbers were distributed to the four stand-ins. (T. 19). Each stand-in placed his signature on the back of his numbered card. *Id.* The lineup participants were then placed in a room equipped with a one-way mirror. (T. 18). Taylor was given his choice as to his position in the lineup, (T. 19), and before the witnesses viewed the lineup, a photograph was taken of the lineup in the exact positions in which the participants would be viewed. (T. 23).

Prior to the lineups, Bailey had been brought to the precinct and was asked to wait in a room which resembled a "lunchroom." *Id.* While Detective Anderson and Bailey were alone in the lunchroom with the door shut, Anderson instructed Bailey that he would see five black males standing and holding numbers, that each participant would step forward, look left, then right, and then return to his place in line, (T. 21–22), and that if he should happen to see the subject that robbed him he was to identify him by the number which he held. (T. 22–23). Anderson then escorted Bailey to the lineup room. (T. 23–24). Bailey identified Rodolfo Taylor as the person who had robbed him. (T. 24). Bailey was then sent back into the lunchroom, the door was shut and a second viewing was arranged. (T. 24–25). The procedure for the second lineup was the same as that used to conduct the first lineup.[3] Bailey again identified Taylor, as the person who had robbed him. (T. 26). The photographs of each of the lineups which Bailey viewed were introduced into evidence. (T. 27).

Detective Anderson testified as to the procedures used to conduct each of the two lineups viewed by Farrell (T. 34–47), Ford (T. 48–56), Young (T. 57–66), and Meenahan. (T. 67–74). A review of the hearing record reveals that this testimony is virtually identical to the testimony given about the lineups which were shown to Bailey.[4] After each witness viewed each of the two lineups shown, he or she identified Rodolfo Taylor as the perpetrator of the respective robbery.[5]

---

3. Petitioner was again given his choice of number and position in line, and all participants signed the card they held on a second line placed on the back of the numbered cards. (T. 25). The reconstituted lineup was photographed and Bailey viewed the second lineup. *Id.*

4. Each lineup consisted of five black male participants, one of whom was the petitioner and all wore blue coveralls. (T. 35–36, 49, 61, 69). Each participant held a numbered card from one through five and had signed the back of the card they held, and petitioner had been given his choice of number and his position in line each time. (T. 36, 49, 54, 61, 64A, 69, 71). The witnesses were also given instructions prior to viewing which were identical to those given to Bailey. (T. 37–38, 50, 54, 63, 64A–65, 69–70). They were told they would see five black males through a one-way glass who would be wearing blue coveralls and would be holding numbers. The witnesses were instructed that "if [they] saw,

could positively identify the subject that robbed [them]" they were to tell Anderson the number held by the suspect. Prior to and between each viewing, each witness remained in the lunchroom with the door closed, while the second viewing was arranged. (T. 50–51, 53, 54, 62, 64A, 69, 71).

5. Farrell viewed the lineup and identified number five and then number three, as the robber, both of which had been held by Taylor. (T. 39, 42). Young identified number three in the first lineup and number four in the second lineup as the person who had robbed her, and these numbers had been held by petitioner. (T. 61, 64A, 65). When Ford viewed his first lineup he made a gesture "commonly referred to as giving one the finger" when petitioner approached the window and stated "[T]hat's him." (T. 52–53, 55, 113–14, 145)" ... he's holding number 2." (T. 53, 113). Taylor had held number two. (T. 49). During the second lineup, Ford again made the

Anderson testified that at no time did he mention to any of the witnesses who viewed the lineups that a suspect was in the lineup, nor did he suggest to any of the witnesses who they should identify. (T. 76–77). The photographs of the lineups viewed by Farrell, Ford, Young and Meenahan were all admitted into evidence, (T. 44, 60, 66, 74).

During cross examination Detective Anderson acknowledged that the photograph of the petitioner which was shown to Bailey was approximately four years old, (T. 128), and that some of the lineup stand-ins were slightly shorter than Taylor. (T. 122–23).

The trial court issued a written decision denying Rodolfo Taylor's motion to suppress evidence on the grounds that the lineups or photo spread were unduly suggestive or that the arrest of the defendant was illegal and without probable cause in violation of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) ("the *Wade* decision"). Judge Weissman set forth lengthy findings of fact regarding the photo spread and the lineups:

> Five individuals observed the lineups [on July 3]. The procedure followed was the same for each witness. The lineups were composed of five males dressed in blue coveralls. Each witness viewed two lineups of the same five black males. Prior to each lineup, the defendant was given his choice of number a number to hold. After the defendant chose a numbered card the other four men in the lineup took the remaining cards. The defendant was then given the opportunity to choose the position in the lineup, after which the other four men also chose their positions. Photographs were taken of each lineup. The numbers and positions of the men were different in each lineup. The witnesses each viewed two lineups. The viewing was done through a one-way window. The witnesses were in one room with Detective Anderson and the defendant the other four men were comprising the lineup were in a room on the other side of the window. Each man walked up to the window,

turned his head to the right, then left and walked back to his place in line. The witnesses were told to say nothing except to indicate the number of the person they recognized. Each of the five witnesses identified the defendant, [ ], at two viewings. These identifications were made separately. None of the witnesses viewed any lineups in the company of any other witnesses. The witnesses did not have an opportunity to speak to each other or discuss the lineups, nor did they have an opportunity to see the defendant or the other men who made up the lineup prior to the actual viewing.

Judge Weissman then concluded that:

> All the lineups were fairly constituted. None were unduly suggestive. The photo spread identification was also conducted fairly and free from undue suggestiveness. The People have also met their burden of showing that there was probable cause to arrest the defendant. A photographic identification provides probable cause for a valid arrest even if the identification would not be admissible at trial; *People v. Nelson*, 79 A.D.2d 171, 436 N.Y.S.2d 505, *cert. denied. sub. nom., Usher v. New York*, 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172.

(*See*, Opinion of Hon. Weissman, Respondent's State App. Brief, Exh A).

*C. The Trials:*

*1. The June Trial: The Texaco & June 2nd Shell Robbery*

> *A. The People Case:*
>
> > *The Texaco Robbery*

Gary Meenahan testified that at approximately 2:00 a.m., on February 22, 1984, he had been working as an attendant at the Texaco station on Motor Parkway in Brentwood. Meenahan was inside the office when he observed a man, whom he testified was Rodolfo Taylor, walk towards him from a dark van parked across the street. (T. 417, 430, 450). Taylor entered the office area and asked for cigarettes. Meenahan turned away to get the cigarettes and when he turned

---

same finger gesture and identified number one as the perpetrator which was held by Taylor. (T. 55). Meenahan positively identified number five

in the first lineup and number one in the second lineup as the man who had robbed him, both of which were held by petitioner. (T. 69–72).

back around, Taylor held a knife to his stomach. (T. 418, 435–6). Taylor demanded money and Meenahan handed him what was in his pocket, and also opened the cash drawer. Taylor reached in, took the money, (T. 419) then ran to the van parked across the street and drove away. (T. 420). Meenahan testified that the perpetrator was a black male in his late twenties, approximately 5'11", with short, curly black hair and a medium build. (T. 420, 431). Meenahan further testified that he had been wearing a black leather jacket, dungarees, and work shoes and that he had not seen any scars or moles on the perpetrator's face. (T. 430). Meenahan testified that he had attended two separate lineups at the Third Precinct on July 3, 1984, and that he had identified petitioner in both lineups as the person who had robbed him on February 22, 1984. (T. 421, 423, 425–426). When asked if he could identify the perpetrator of the robbery and the individual he had identified at the lineups, Meenahan pointed to the petitioner. (T. 425)

### The First Shell Robbery

Ford, Farrell and Young testified as to what occurred during the robbery of the Shell gas station on June 2, 1984. Ford and Young were visiting Farrell who was working at the Shell station on Route 111 and Spur Drive North in Central Islip. (T. 307). At approximately 11:50 p.m., they observed a black male, who they all identified at trial to be Rodolfo Taylor, walk into the station. (T. 308, 315, 347, 350–51, 382, 402). Taylor approached them and asked "Who's got the money?" (T. 389–90). Ford and Young stood up, Young retreated towards the main building, (T. 312) and Farrell ran to the Northville gas station across the street. (T. 390). Ford testified that he remembered Taylor "standing there with his hand in his jacket," (T. 312–13) and although he actually did not see a gun, he saw "a bulge," and that it "looked like there could be a gun in there." (T. 313, 334). Young testified that when the Taylor put his hand in his pocket, he pointed something towards her, (T. 371–72) and that it "looked like a gun." (T. 360). Young stated that after Taylor asked "Who has the money?," he threatened that if he did not get the money "he'd start shooting." (T. 348).

Taylor then opened up the cash drawer and started taking money. (T. 348).

At trial, Ford, Farrell and Young all gave similar descriptions of the robber of the Shell station. Ford claimed that he had observed Taylor for at least three minutes during the robbery. (T. 315) He described him as a black male, approximately 20–23 years old, about 6'0" tall, with a thin build short Afro, a thin mustache and hair in the center of his chin. (T. 310). Ford also stated he had been wearing a tan jacket. *Id.* According to Farrell, he had observed the robber for about five minutes, (T. 402) and described him as a black male, approximately 20–23 years old, 6'2" tall, weighing approximately 160 pounds, with "a short tight afro", a small mustache and goatee, and that he had worn a tan outfit. (T. 349–50, 387–389). Young claimed to have observed Taylor between two to three minutes. (T. 360) She described him as 6'0" tall, 160 pounds wearing a tan designer jacket and tan corduroy pants and having black hair in a tight afro (T. 349–50). Each of the three witnesses testified that on July 3, 1984, he or she had separately viewed Taylor in two lineups at the Third Precinct and identified him as the robber of the Shell station (T. 317, 354, 395, 467).

### B. The Defendant's Case:

The defense called two witnesses: 1) Beverly Woods, who testified that she had known the petitioner for the last five years and that in February 1984, petitioner had had a scar approximately 2–2 ½ inches long on his left brow over his left eye, (T. 519–520), and 2) Richard Froberg, who testified that petitioner had been employed by his company on February 22nd and June 2, 1984 and during that time petitioner was clean shaven. (T. 550). Froberg also testified that on July 3, 1984, petitioner did not have a beard. (T. 522). The petitioner did not testify on his own behalf.

### 2. The September Trial: The June 10th Shell Robbery

### A. The People's Case:

Harold Bailey testified that on June 10, 1984, he had been working at the Shell gas

station on Spur Drive in Central Islip. (S.34). He described the gas station as a main building and small glass booth in the middle of the island from which the gas is pumped. (S.35–37). At approximately 11:45 p.m., Bailey was measuring the amount of gasoline in the tanks when he noticed a black male riding a ten-speed bike on the sidewalk approximately 150 to 200 feet away. (S.37–38). The man, whom Bailey identified at trial as the Rodolfo Taylor, (S.51–52), rode past the entrance "up to the Shell emblem sign, looking behind him." (S.38). Taylor then turned around and entered the station. *Id.* Bailey testified that when he was within five or six feet of him, Taylor said "Hey, what's up, dude?," and pulled out a knife with a brass rim handle and five inch blade. (S.39, 77). When Bailey saw the knife he ran across the street to an Exxon station and called the police to report the robbery. (S.40, 41).

Bailey testified that from across the street he observed Taylor inside the station's glass booth. (S.41). According to Bailey, Taylor opened the cash drawer and removed a bundle of money. *Id.* During the robbery, Bailey observed a white car pull into the station. (S.43). Bailey saw Taylor walk between the building and the gas tanks where he could not see him. *Id.* Bailey momentarily lost sight of Taylor (S.43–44), but he reappeared, approached Bailey and said "Stop, or I'll shoot." *Id.* Bailey ran back to the Shell station and when he turned around he saw Taylor on his bicycle heading north on Route 111. (S.45). When Bailey checked the cash drawer, $50 in singles that had been wrapped in a rubber band were missing. (S.47).

At trial, Bailey testified that the station had been well lit on the night of the robbery. He described the station as having "two poles with canopy lights [ ] point[ing] down towards the street, signs on the corner," "four canopy-type lights on the island, and lights around the rim and on the inside of the building." (S.47). Bailey also testified that the perpetrator had been a little over 6'0" tall, in his early twenties, with hollow checks, a "very short afro haircut, very close to the scalp," and wearing a blue short sleeve shirt. (S.46, 74). Bailey also testified that on July

3, 1984, he visited the Third Precinct to view a two lineups in which he identified Taylor as the individual who robbed the Shell station that night (S.50–51).

*B. The Defendant's Case:*

First, the defense called Jacqueline Davis, the driver of the white car, who described the person she saw that night as a young black male with a short afro and slim build. Although she claimed that she only saw the robber for "just a second," she testified that Taylor was not the man she had observed. (S.136, 130). Davis also denied having seen a knife. (S.132) She admitted that her son knew Taylor, but denied knowing him personally. (S.146).

Beverly Woods was called to testify that she had been with petitioner from 11 a.m. to 7:45 p.m., on June 10, 1984, and that at approximately 8 p.m., she accompanied him to the Taste of Honey bar, where she remained with him until about midnight. (S.172–175). When it was brought to her attention that petitioner had been in police custody that day on an unrelated criminal charge, Woods recanted her testimony. (S.199). Finally, Taylor took the stand and testified on his own behalf that he had been at the Taste of Honey bar on the night in question from 8 p.m. until about 12:30 p.m. with another friend Debbie Dixon. (S.219–220).

The trial court charged the jury as to robbery in the first degree. The jury found Rodolfo Taylor guilty as charged. Thereafter, both convictions were consolidated for purposes of direct appeal.

On appeal, Taylor was represented by new counsel.

## II. EXHAUSTION

Under 28 U.S.C. § 2254, a federal court may not review the substantive merits of a writ, unless the petitioner has exhausted his remedies in state court. 28 U.S.C. § 2254(b) (1988); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Exhaustion is not a jurisdictional requirement. *Velez v. New York*, 941 F.Supp. 300, 309 (1996), *citing, Castille v. Peoples*, 489

U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). It is predicated on principles of federal-state comity by giving the state the initial opportunity to pass upon and correct alleged violations of its prisoner's federal constitutional rights. *Id.*

The Second Circuit has set forth a two pronged test to determine whether an applicant for federal habeas corpus relief has exhausted the state remedies available to him. First, the grounds asserted must have been "fairly presented" to the state courts. *Levine v. Comm'r of Correctional Serv.*, 44 F.3d 121, 124 (2d Cir.1995); *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir.1992); *Daye v. Att'y Gen.*, 696 F.2d 186, 190 n. 3 (2d Cir. 1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). A petitioner has "fairly presented" his federal claims when he has set forth in the state courts all the essential factual allegations and substantially the same legal doctrines he asserts in the federal petition. *Daye*, 696 F.2d at 191–92. This may be done in a number of ways, including: 1) citing specific provisions of the Constitution; 2) relying on pertinent federal cases employing constitutional analysis or state cases employing constitutional analysis in similar fact situations; 3) asserting the claim in particular terms calling to mind a specific right protected by the Constitution; or 4) alleging a fact pattern which is well within the mainstream of constitutional litigation. *Daye*, 696 F.2d at 194.

The second prong of the Second Circuit's exhaustion test generally requires that the habeas petitioner utilize all available avenues of appellate review within the state-court system before proceeding to federal court. *Bacchi v. Senkowski*, 884 F.Supp. 724 (E.D.N.Y.1995), *citing, Daye*, 696 F.2d at 190. While this criterion typically requires a direct appeal to the highest court of the state, *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), it may also be satisfied where the applicant has collaterally attacked the judg-

ment of conviction within the state courts and thereafter appealed the denial of this application to the highest state court. *See, Dorsey v. Irvin*, 56 F.3d 425, 426 (2d Cir. 1995); *Velez*, 941 F.Supp. at 310; *Bacchi*, 884 F.Supp. at 730; *Lloyd v. Walker*, 771 F.Supp. 570, 574 (E.D.N.Y.1991).

Petitioner appealed both of his convictions to the Appellate Division, Second Department. On direct appeal, he raised the following arguments: 1) that he was in custody and entitled to counsel when he appeared in various lineups; 2) that the trial court erroneously excluded evidence at the *Wade/Dunaway* hearing; 3) the lineups were unduly suggestive and 4) the trial court erred by entering a guilty verdict of robbery in the first degree rather than robbery in the second degree. The Appellate Division issued a written opinion affirming both convictions. *People v. Taylor*, 133 A.D.2d 866, 520 N.Y.S.2d 419 (2d Dep't 1987). Petitioner then sought leave to appeal to the Court of Appeals, which was denied. *People v. Taylor*, 70 N.Y.2d 960, 520 N.E.2d 562, 525 N.Y.S.2d 844 (1988).

Petitioner attempted to collaterally attack his convictions pursuant to New York Criminal Procedure Law ("CPL") § 440.10 (McKinney's 1994) and raised the following grounds in support of his motion: (i) that he was illegally seized by his parole officer in violation of his fourth amendment rights and (ii) that his trial counsel's assistance was ineffective because defense counsel failed to investigate his parole officer's conduct and his subsequent placement in the lineups.[6] On November 15, 1993, the trial court issued a written decision denying petitioner's § 440 motion,[7] and on November 24, 1993, petitioner appealed the denial of the § 440 motion to the appellate division, but leave was denied.[8] Therefore, all six of the claims which petitioner now raises have been exhausted.

Once the court is satisfied that a habeas petitioner has exhausted his state reme-

---

6. See, Petition for Writ of Habeas Corpus, Exh. B. (Petitioner's Affidavit in Support of his § 440 motion dated September 23, 1993, ¶¶ 11–15).

7. See, Respondent's Aff. in Opp. to the Petition for Writ of Habeas Corpus, Exh. C. (Decision & Order of Hon. Weissman).

8. See, Respondent's Aff. in Opp., Exh. D, (Decision & Order dated January 10, 1984, Thompson, W., J.)).

dies, it does not necessarily follow however that the applicant's substantive claims are amenable to federal review. A federal court is generally precluded from reviewing any claim in a habeas petition for which a "state court rests its judgment on an adequate and independent state procedural bar," *Jones v. Vacco*, 126 F.3d 408, 414 (2d Cir.1997), *citing, Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996) (citations omitted), unless the petitioner can "show cause for the default and prejudice attributable thereto or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Bacchi*, 884 F.Supp. at 731, *citing, Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotations omitted.); *see also, Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Wedra v. LeFevre*, 988 F.2d 334, 338 (2d Cir.1993).

■ "A state procedural bar arises through a failure to make a timely appeal or through a failure to preserve a claim of appeal by contemporaneous objection." *Reid* 961 F.2d at 377; *see also, Arce v. Smith*, 889 F.2d 1271, 1273 (2d Cir.1989) *cert. denied*, 495 U.S. 937, 110 S.Ct. 2185, 109 L.Ed.2d 513 (1990) (under New York law, failure to raise a claim that could have been raised on direct appeal constitutes a procedural default), and "a federal court will not hold a claim procedurally barred unless the last state court rendering a judgment in the case *clearly* and *expressly* states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489

U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (internal quotations omitted); *Rollins v. Leonardo*, 938 F.2d 380 (2d Cir.1991) (federal habeas petitioner barred by procedural default where state decision based on plain statement of procedural default under state law); *Lloyd v. Walker*, 771 F.Supp. 570 (E.D.N.Y.1991). In cases in which numerous claims are asserted, the state court's judgment must "unequivocally refer to a state procedural bar as to each specific claim; for a state court's ambiguous invocation of a procedural default does not bar federal habeas review." *Bacchi*, 884 F.Supp. at 731, *citing, Harris*, 489 U.S. at 264, 109 S.Ct. 1038.

■ Petitioner procedurally defaulted in the state courts with respect to his illegal arrest and ineffective assistance of counsel claims since he failed to raise these claims on direct appeal. Instead, he first raised these arguments on collateral attack pursuant to CPL 440.10.[9] This court is not, however, precluded from addressing the merits of these claims despite the procedural default since the state trial court did not clearly and expressly rest its denial of these claims on a procedural bar. The trial court's § 440 decision reads in pertinent part:

In the supporting affidavit, the defendant claims that he was deprived of the effective assistance of counsel ... based on the failure of defense counsel to raise certain issues. The defendant questions the propriety of the viewing of the Photo spread by [Bailey], a subsequent lineup ... and

9. "Under New York law, claims of ineffective assistance of trial counsel generally must be addressed to the trial court in the § 440.10 motion rather than on direct appeal because they ordinarily relate to matters of which only the trial court is aware and/or require knowledge and or review of the trial proceedings of which no record was ever made." *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir.1994); *Mercado v. Senkowski*, 736 F.Supp. 28, 29 (E.D.N.Y.1990). Thus, the failure to raise such a claim on direct appeal will not be considered a procedural default. See, *Billy–Eko v. United States*, 8 F.3d 111, 114 (2d Cir.1993). However, where the claimed instances of trial counsel error are matters to which the record is already clear, the claim can be reviewed by the appellate court and should be raised on direct appeal, *Barrett v. Scully*, 203 A.D.2d 311, 612 N.Y.S.2d 895 (2d Dept. 1994); *Garcia v. Scully* 907 F.Supp. 700, 706 (S.D.N.Y.

1995), and the failure to do so is a procedural default. See also, *Billy–Eko*, 8 F.3d at 114–115.

Here, petitioner was represented by new appellate counsel and a full Wade hearing had been conducted during which the circumstances of his arrest and his counsel's attempts to suppress the lineup identifications appeared on the record. Therefore, petitioner's failure to raise these claims on direct appeal constitutes a procedural default under CPL § 440.10(2)(c) which states, in pertinent part:

(2) The court must deny a motion to vacate judgment when: (c) although sufficient facts appear upon the record of the proceedings underlying the judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal ...

the part played by his parole officer and two Suffolk County detectives in placing him in the line-up.

Although a post-conviction motion pursuant to § 440.10 is an appropriate remedy in addressing the effectiveness of counsel on matters *de hors* the record ... [h]ere we have a complete *Wade* hearing with the actions of counsel appearing on the record. Moreover, on appeal, the issues were raised in the Appellate Division.

The trial court then concluded:

Since the issues raised upon this motion have been previously determined on the merits on appeal from the judgments *(C.P.L. § 440.10(2)(a))*, the motion to vacate the judgments is denied. (emphasis added).

See, Memorandum & Decision of Hon. Weissman, dated Nov. 15, 1993, (Respondent's Aff. In Opp., Exh. C.).

"A dismissal under § 440.10(2)(a) [10] is not based on any procedural default. To the contrary, it is premised on a prior decision." *Anderson v. Scully*, No. Civ. 90–0171, 1991 WL 156234 at *3 (Aug. 7, 1991 S.D.N.Y.); *see also, Hartley v. Senkowski*, No. Civ. 90–0395, 1992 WL 58766 at *10 (Mar. 18, 1992 E.D.N.Y.) ("A procedural rule such as § 440.10(2)(a) acts neither as a procedural bar nor as a decision on the merits."). Thus, this "subsection applies only to claims that have been previously decided on the merits and does not constitute a state law ground for dismissal that is independent of the merits of petitioner's federal claims." *Anderson*,

1991 WL 156234 at *3, *citing, Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Therefore, since the trial court expressly relied on CPL § 440.10(2)(a) to deny petitioner's application, it cannot be said that the court relied on a procedural bar,[11] and this court is not precluded from turning to the merits of these two claims.

## III. MERITS OF THE PETITION

### A. RIGHT TO COUNSEL AT LINEUPS:

Petitioner argues that the failure to provide him with counsel when he appeared in the series of lineups violated his "constitutional rights." Although petitioner has not specified whether he is asserting a right to counsel under the fifth or sixth amendment, the court presumes he has claimed a violation of his sixth amendment rights since it is well-settled that the fifth amendment protection against self incrimination and the right to have counsel present under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) do not apply to pre-indictment lineups. *People v. Hawkins*, 55 N.Y.2d 474, 482, 450 N.Y.S.2d 159, 163, 435 N.E.2d 376 (N.Y.1982); *Kirby v. Illinois*, 406 U.S. 682, 687, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972) (noting that *Miranda* is inapplicable to pre-indictment lineups since the constitutional privilege against compulsory self-incrimination is in no way implicated where a person is compelled to merely exhibit his person for observation by a prosecution witness.).

---

**10.** Section 440.10(2)(a) of the CPL, reads in pertinent part:

(2) [T]he court must deny a motion to vacate judgment when: (a) the ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment, . . . .

**11.** It is questionable whether the trial court was correct in relying upon § 440.10(2)(a) to deny petitioner's arrest and ineffective assistance claims since a review of petitioner's state appellate brief reveals that he only discussed his parole officer's conduct and the circumstances of his arrest in support of his claim that he was entitled to counsel at the lineups. Since petitioner did not challenge the propriety of his arrest or his counsel's assistance on direct appeal and since the appellate court did not decide the mer-

its of these claims, § 440.10(2)(a) may be inapplicable to deny post-judgment relief. While the 440 court clearly could have dismissed these claims as procedurally barred under § 440.10(2)(c), which precludes review of a claim raised collaterally where it could have been raised on direct appeal, the trial court did not invoke this subsection.

Even if this court were to construe the 440 court decision as relying upon § 440.10(2)(a) with respect to only petitioner's Photo spread and lineup identifications claims (which were raised on appeal), the 440 court's silence with respect to the arrest and ineffective assistance claim cannot permit this court to conclude that that court "clearly and expressly" dismissed these claims due to petitioner's procedural default.

Petitioner's argument is premised on his assertion that he was under arrest at the time he appeared in the lineups. He argues that the police were required to obtain a court order to secure his appearance in the lineups. Instead, the petitioner claims the police bypassed this requirement by having his parole officer, Officer Houlan, transport him to the precinct. Petitioner claims that he did not voluntarily accompany Officer Houlan to the precinct because he did not feel free to refuse his request, and as such, he was effectively arrested by Officer Houlan and in custody at the precinct when the lineup took place. Petitioner asserts that under these circumstances the police were required to provide him counsel. Finally, petitioner claims that formal proceedings were initiated against him when Officer Houlan transported him to the precinct which caused his sixth amendment right to counsel to attach.

■ The test of whether an individual is in custody is "not what the defendant thought, but rather what a reasonable person innocent of any crime, would have believed had he been in the defendant's position." *People v. Parsad,* 243 A.D.2d 510, 662 N.Y.S.2d 835, 836 (N.Y.A.D.2d Dep't) (*quoting, People v. Yukl,* 25 N.Y.2d 585, 589, 307 N.Y.S.2d 857, 256 N.E.2d 172 (1969)); *People v. Padget,* 242 A.D.2d 390, 661 N.Y.S.2d 993, 994 (2d Dept' 1997) (same); *United States v. Mussaleen,* 35 F.3d 692, 697 (2d Cir.1994) ("The test for ... custody is 'whether a reasonable person in the defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'"), *quoting, Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

■ There is nothing in the record which supports petitioner's claim that he was under arrest and in custody when he was taken to the precinct to participate in the lineups. First, petitioner does not claim, nor does the record indicate, that Officer Houlan did more than ask him to go to the precinct (T. 139–40, Appellant's Brief at pp. 28–33). Detective Anderson's testimony at the Wade hearing established that when the petitioner arrived at the precinct at approximately 10 a.m. (T.

94,96), he was placed in an interview room where he sat until approximately 2 p.m. (when the lineups began), that he was not handcuffed, (T. 96) and that most of that time he was left alone. (T. 95). According to Anderson, after the witnesses had identified the petitioner as the perpetrator of the respective robbery, "for all intent and purposes he was [technically] under arrest for that robbery." (T. 156).

It is difficult for the court to credit petitioner's claim that when his parole officer asked him to go to the precinct he considered this the equivalent of an arrest. Petitioner has an extensive criminal record which reflects over thirty arrests (T. 228), and "a good number of years in prison on felony charges." (T. 235). Given this criminal history, petitioner's claimed failure to appreciate the difference between a police officer responsible for investigating crimes and his own parole officer, whose responsibility was essentially limited to supervising his release on an earlier conviction is unconvincing. Petitioner's assertion that his will was overridden because he feared that Officer Houlan might retaliate in some unspecified way, falls short of stating facts which could reasonably give rise to the belief that he was under arrest. It is also unlikely that petitioner perceived his stay at the precinct (where he was left essentially on his own and not handcuffed to be equivalent to the circumstances which he experienced when he had actually been placed under arrest.)

■ Petitioner's argument that the police were required to obtain a court order to secure his appearance at the lineups is also without merit. Petitioner appears to be arguing that because the police had probable cause to arrest him before the lineups took place (based upon Bailey's identification of petitioner two days earlier) they were required to secure his appearance through a court order (presumably an arrest warrant). Petitioner cites no authority for the "duty to arrest" argument he makes. In fact the law is to the contrary.

■ The law does not require the police to arrest a suspect as soon as the threshold requirements of probable cause are met, be-

fore being satisfied that enough evidence exists to prove guilt beyond a reasonable doubt. *United States v. Lovasco*, 431 U.S. 783, 795–96, 97 S.Ct. 2044, 52 L.Ed.2d 752, *reh'g denied*, 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 (1977); *Buie v. Sullivan*, 923 F.2d 10, 13 (2d Cir.1990) ("Once probable cause exists, of course, law enforcement is legitimately empowered, but not required to arrest the suspect.") *see also, People v. Hoff*, 110 A.D.2d 782, 487 N.Y.S.2d 851 (2d Dept.1985). While it is conceded that the police had probable cause to arrest petitioner for the June 10th robbery after Bailey identified him in the photo spread, petitioner had not yet been identified as the perpetrator in the other two robberies. The police were entitled to wait to complete their investigatory lineups before arresting him.

 Finally, even assuming that petitioner was under arrest at the time he appeared in the lineups, petitioner would not have been entitled to counsel. It is well established that under the Sixth Amendment an individual's right to counsel only attaches when "formal adversarial judicial proceedings" have been initiated against him, *Horn v. Smith*, No. 94 Civ. 2781, 1997 WL 391461 at *3 (July 7, 1997, E.D.N.Y.), *citing, Kirby v. Illinois*, 406 U.S. at 688, 92 S.Ct. 1877; *Claudio v. Scully*, 982 F.2d 798, 802 (2d Cir.1992), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2347, 124 L.Ed.2d 256 (1993) ("A defendant is not constitutionally entitled to the assistance of counsel in all pre-trial circumstances but only those critical stages in proceedings."), and a federal court must look to state law to determine when adversary judicial proceedings have begun for sixth amendment purposes. *Meadows v. Kuhlmann*, 812 F.2d 72, 76 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

 The New York Court of Appeals in *People v. Hawkins*, 55 N.Y.2d 474, 487, 450 N.Y.S.2d 159, 435 N.E.2d 376 (1982), held that a defendant's appearance in an investigatory lineup *even after arrest* does not trigger a Sixth Amendment right to counsel. In so holding, the Court adopted almost verbatim the conclusions reached by the Supreme Court in *Kirby v. Illinois*, 406 U.S. at 688, 92 S.Ct. 1877 and held that:

The right to the assistance of counsel at corporeal identifications ... arises only after the initiation of formal prosecutorial proceedings....

Under New York law the commencement of the adversarial process is triggered by either 1) the filing of an accusatory instrument, 2) an arraignment 3) an arrest warrant or 4) a court removal order to transfer a prisoner to another location for the purpose of investigating a crime. *Id.* at 77; *People v. Jackson*, 74 N.Y.2d 787, 545 N.Y.S.2d 95, 543 N.E.2d 738 (1989) (court removal order); *People v. Blake*, 35 N.Y.2d 331, 339, 361 N.Y.S.2d 881, 890–91, 320 N.E.2d 625 (1974) (arraignment, arrest warrant).

While New York courts have been fairly liberal in their interpretation of when the adversarial process and hence, the right to counsel begins, *Gonzalez v. Sullivan*, No. 88 Civ. 1459, 1990 WL 126189 at *2 (Aug. 30, 1990, E.D.N.Y.), this court could find no case in which formal adversarial proceedings were deemed to commence upon arrest by a parole officer.

The appellate court's finding that petitioner had no right to counsel because formal adversarial proceedings had not been commenced at the time petitioner appeared in the lineup was entirely consistent with New York law. See, *People v. Taylor*, 133 A.D.2d 866, 520 N.Y.S.2d 419 (2d Dep't 1987).

## B. *ILLEGAL ARREST & INEFFECTIVE ASSISTANCE OF COUNSEL:*

Petitioner's argument that he was in custody and therefore under arrest at the time Officer Houlan transported him to the precinct is also the premise for petitioner's illegal arrest and ineffective assistance of trial counsel claims. Specifically, petitioner claims 1) that he was illegally arrested at his home in violation of his fourth amendment rights and, therefore, 2) his counsel's failure to move to suppress the lineup identification, pursuant to *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), as a product of the illegal arrest constitutes ineffective assistance of counsel in violation of his Sixth Amendment rights.

**1. *"Illegal Arrest"*:**

■ A *Payton* motion challenges a warrantless non-consensual entry into a suspect's home for the purposes of making an arrest as violative of the Fourth Amendment when such entry is not· justified by exigent circumstances. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). To the extent that petitioner argues that he was illegally arrested at his home in violation of *Payton,* this court is precluded from addressing the merits of his claim under *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In *Stone v. Powell,* the Supreme Court curtailed federal habeas corpus review of Fourth Amendment claims arising out of state court convictions where the state has provided an opportunity for full and fair litigation of the fourth amendment challenge. *Id.* at 482, 96 S.Ct. 3037. *See also, Gates v. Henderson,* 568 F.2d 830, 836–837 (2d Cir.1977) (en banc), *cert. denied.,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978); *McRoy v. Fogg,* No. Civ.87–1551, 1989 WL 18753 at *7 (Feb. 22, 1989 E.D.N.Y.) (applying *Stone* to petitioner's claim that his confession should be suppressed as a product of his unlawful arrest).

This Circuit has adopted a litmus test to determine whether the state has provided an "opportunity for full and fair litigation" of a Fourth Amendment claim: Fourth Amendment claims are only reviewable on a habeas petition where the state has provided no corrective procedures at all to redress the alleged violations, or the state has provided a corrective mechanism but the defendant was precluded from using it because of an unconscionable breakdown in the underlying process. *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992); *Gates v. Henderson,* 568 F.2d at 840.

·Petitioner cannot claim that the state procedures for redress of his Fourth Amendment claim were inadequate since the federal courts in this circuit have expressly approved New York's procedure for litigating Fourth Amendment claims which is embodied in N.Y.Crim.Proc.L. § 710 et seq.· (McKinney's 1984 & Supp.1988) as facially adequate. *Gates,* 568 F.2d at 837 & n. 4; *Holmes v. Scully,* 706 F.Supp. 195, 201 (E.D.N.Y.1989);

*Shaw v. Scully,* 654 F.Supp. 859, 864 (S.D.N.Y.1987).

■ Petitioner has not alleged that there was an unconscionable breakdown in the procedure, nor could he. To allege such a breakdown, petitioner would have to prove that "no state court ... conducted a 'reasoned method of inquiry into relevant questions of fact and law' or any inquiry at all into the Fourth Amendment claim." *McRoy v. Fogg,* No.· Civ. 87–1551, 1989 WL 18753 (Feb. 22 1989, E.D.N.Y.); *Shaw,* 654 F.Supp. at 864, quoting, *Cruz v. Alexander,* 477 F.Supp. 516, 523 (S.D.N.Y.1979). Because petitioner has already challenged the existence of probable cause for his arrest at the pretrial *Wade/Dunaway* hearing and obtained such review his claim is not subject to further habeas review. While the court cannot consider the illegal arrest argument as an independent basis for habeas review, it may nonetheless consider this argument as it relates to petitioner's ineffective assistance of trial counsel claim. *See, Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (Supreme Court rejected arguments that *Stone v. Powell* bars petitioner's Sixth Amendment ineffective assistance claim for counsel's failure to raise Fourth Amendment violations.)

**2. *Ineffective Assistance of Counsel*:**

Petitioner next argues that his trial counsel's failure to make a motion to suppress the lineup identifications as the product of an illegal arrest under *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) constitutes ineffective· assistance of counsel.

■ The Supreme Court in *Strickland v. Washington* established the standard by which counsel's conduct is reviewed when a Sixth Amendment claim of ineffective assistance of trial counsel is raised. First, counsel's performance must be shown to have been so deficient as to not be within the realm of reasonable professional competence. Furthermore, it is clear that "defense counsel is not required to move for suppression on every conceivable ground in order to meet the level of competence required by the Sixth

Amendment." *United States v. DiTommaso,* 817 F.2d 201, 215 (2d Cir.1987); *United States v. Aulet,* 618 F.2d 182, 187 (2d Cir. 1980); *Burress v. Henderson,* 814 F.Supp. 313, 324 (W.D.N.Y.1993). It is sufficient under the Sixth Amendment that counsel exercised professional discretion in deciding whether adequate grounds for the suggested *Payton* motion existed. *see, LiPuma v. Comm'r Dept. of Corrections,* 560 F.2d 84, 93 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977). Once a petitioner shows that his counsel's conduct was "constitutionally deficient" he must then show that he was "deprived of a fair trial, a trial whose 'result is reliable' because of errors of trial counsel." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Tsirizotakis v. LeFevre,* 736 F.2d 57, 62–63 (2d Cir.1984). Finally, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

■ Petitioner has failed to establish that his trial counsel's conduct was constitutionally deficient. As discussed above, the facts do not support petitioner's claim that he was under arrest at the time Officer Houlan transported him from his home to the precinct. The police may properly attempt to secure cooperation from a suspect. Contrary to petitioner's apparent assertion, *Payton* is not violated when the police visit a suspect's home, without a warrant, for the purposes of investigation and request that the suspect cooperate by accompanying them to a police station. *See, United States v. Mussaleen,* 35 F.3d 692, 697 (2d Cir.1994) (officers may request that suspect accompany them to precinct and even though suspect did not feel free to leave police vehicle this was not an arrest).

Since *Payton*'s prohibition against effectuating a warrantless house arrest was inapplicable to this case, counsel's decision not to seek suppression of the lineups on this basis was therefore not constitutionally deficient. Counsel did seek, though unsuccessfully, to challenge and suppress the lineup identifications at the Wade hearing on grounds that the procedures used were suggestive. It appears that counsel asserted those arguments she believed to be more meritorious. Since this court finds that counsel's conduct was not constitutionally deficient, it is not necessary to evaluate the trial counsel's conduct under the second prong of *Strickland.*

### C. SUGGESTIVENESS OF LINEUP IDENTIFICATIONS:

Petitioner next claims that the lineup procedures were unduly suggestive in two respects: 1) showing the photo spread to the witness Bailey two days before he viewed the lineups facilitated and therefore tainted his identification of petitioner at the lineups, and 2) the lineup composition was suggestive because petitioner was taller than the other participants.[12]

With respect to petitioner's first claim, it is important to note that petitioner did not establish that the photo spread which was shown to Bailey was impermissibly suggestive. The trial court found and that determination is not challenged in this petition:

"The photo spread identification was also conducted fairly and was free from undue suggestiveness." (*See,* Opinion of Hon. Weissman, Respondent's State App. Brief, Exh A).

■ Instead, petitioner asserts that viewing a photo spread close in time to a lineup taints the later identification. This claim is without merit. The record below reflects that Officer Anderson did nothing to focus Bailey's attention on a particular individual in the photo spread or to pressure him into

---

12. Petitioner's claim that conducting all the lineups in one day "invited a prejudicial atmosphere which permeate[d] the entire proceedings" is rejected as being without merit. Petitioner's assertion that the witnesses may have communicated with one another at the precinct about identifying petitioner in the lineups is based on pure conjecture and is contradicted by the record. At the *Wade* hearing, Anderson testified that no two witnesses were in the same room at the same time together (T.98), and if they were in the precinct at the same time, "they were not permitted to sit together or speak—they were kept separated." (T.99), and this testimony was accepted as truthful by the trial court, as reflected in the *Wade* decision.

making an identification. (T.76–77). Furthermore, it appears that Bailey's identification was independently reliable since the record reflects that he had adequate opportunity to observe the petitioner for a few minutes during the commission of the crime, (S.48–49) and Bailey's description of the petitioner (S.46), comported with the petitioner's pedigree information recorded by Anderson at the time of the arrest (S.102).These factors substantially reduce the likelihood that the witness's identification was influenced as petitioner suggests.

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court addressed the question when a photo array taints a subsequent identification. The Court concluded that a photo array will taint a subsequent identification and cause it to be set aside only if the photographic procedure used was so impermissibly suggestive as to give rise to a likelihood of misidentification. No such facts are alleged in this case.

 The mere fact that a person called to view a lineup after selecting a photograph from police files would likely expect that suspect to be included in the lineup does not alone invalidate the fairness of the lineup. *Tavarez v. LeFevre*, 649 F.Supp. 526, 531 (S.D.N.Y.1986). The law is clear that the police may use more than one identification procedure to identify suspects as long as the procedures utilized are fair and not suggestive. See *People v. Carter*, 106 A.D.2d 654, 482 N.Y.S.2d 911 (2d Dept' 1984) (not improper to have witness view two photo arrays a few weeks before the lineup where procedures used were not suggestive); *People v. Russo* 52 A.D.2d 62, 382 N.Y.S.2d 506 (1st Dept' 1976) (in-court identification of defendant not tainted by prior photo and in person identification where neither identification procedure was suggestive). The test is not how close in time the identification procedures occur, but whether the procedures are each fairly comprised and administered.

 Turning to petitioner's second argument that the lineups were suggestive because he was taller than the other participants, this claim is also unsupported by the law, and the record. There is no require-

ment that a defendant in a lineup be accompanied by individuals nearly identical in appearance, *Hartley v. Senkowski*, No. CV 90–0395,1992 WL 58766 at *3–4 (Mar. 18 1992, E.D.N.Y.) (claim that lineup comprised of older and more clean shaven individuals rejected under 'totality of circumstances' test where participants were of approximately same height, weight and color); *Tavarez v. LeFevre*, 649 F.Supp. at 530 (S.D.N.Y.1986) (not unduly suggestive that petitioner was shorter than all other participants in the lineup where participants were seated and difference was minimized); *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir.1986) (photographs in an array need not be uniform); *People v. Baptiste*, 201 A.D.2d 659, 608 N.Y.S.2d 266, 267 (2d Dep't 1994) (*citing*, *People v. Chipp*, 75 N.Y.2d 327, 553 N.Y.S.2d 72, 552 N.E.2d 608, *cert. denied*, 498 U.S. 833, 111 S.Ct. 99, 112 L.Ed.2d 70), and a disparity in the height of the lineup participants will not by itself warrant a finding of unnecessary suggestiveness. *United States ex. rel. Pella v. Reid*, 527 F.2d 380, 384 (2d Cir.1975) (the fact that defendant, a short man, was placed in a lineup with mostly taller men does not by itself warrant a finding of undue suggestiveness.). As one court has held "it would be unduly burdensome to require police officials to find five or six very similar individuals for a lineup." *Gossett v. Henderson*, No. 87 Civ. 5878, 1991 WL 135601 at *1, (Jul. 18, 1991, S.D.N.Y.), *citing*, *U.S. v. Barron*, 575 F.2d 752, 755 (9th Cir. 1978).

 The record in this case does not support the claim that there was a significant height variance between the participants in the lineup. The lineup photos introduced at trial reflects that of the five participants, petitioner was nearly identical in height to two other persons and the remaining individuals appear to be only slightly shorter than petitioner. Contrary to plaintiff's claim, the four stand-ins appeared similar to the petitioner in that they were all young black males, of similar height and weight, all similarly dressed in blue coveralls, and with similar hairstyles. This lineup clearly passes constitutional muster. *See, Simmons v. United States*, 390 U.S. at 384, 88 S.Ct. 967,

(the Constitution only bars line-ups that are so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").

■■■ Federal habeas courts reviewing state court determinations of factual matters must treat those determinations as presumptively correct, unless those findings are "not 'fairly supported by the record.'" 28 U.S.C. § 2254(d). Petitioner thus bears the burden of establishing by convincing evidence that the factual determinations by the state court were erroneous. *Hartley v. Senkowski*, No Civ.90–0395 1992 WL 58766 at *3 (Mar. 18, 1992 E.D.N.Y.). After taking testimony and viewing the photos, Judge Weissman set forth lengthy findings of fact regarding the lineup composition and procedures and ultimately concluded that all the lineups were fairly constituted and none were unduly suggestive. See, Opinion of Hon. Weissman, Respondent's State App. Brief, Exh. A. This opinion was also shared by the state appellate court:

> We find that the witness Bailey's selection of the defendant's photograph from a photographic array two days before he picked the defendant out of a lineup did not taint the lineup identifications since there is no argument that the photographic array was in any fashion unduly suggestive and *we conclude that the lineup itself was not unduly suggestive.* (emphasis added.)

*People v. Taylor*, 520 N.Y.S.2d at 420.

This court has reviewed the hearing testimony and photocopies of the lineup introduced at the *Wade* hearing, (see, Respondent's state appellate brief, Exh. A) and finds that the state courts' factual findings are fairly supported by the record and that the courts correctly concluded that the lineup composition was not unduly suggestive. Accordingly, petitioner's claim is rejected.

## D. STATE TRIAL COURT'S ERRORS REGARDING ADMISSIBILITY RULINGS:

Petitioner also claims that the state trial court erred with respect to two evidentiary rulings at the *Wade/Dunaway* hearing. Petitioner claims that the court erred when it precluded petitioner from establishing the exact time of his arrest and how the other lineup participants had been chosen.

■■■■■ "Federal review of a state court conviction is limited to errors of constitutional magnitude," *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), and "discretionary state court evidentiary rulings normally do not rise to a constitutional level so as to be cognizable in a federal habeas proceeding, absent a showing that the challenged rulings violated a specific constitutional right." *Underwood v. Kelly*, 692 F.Supp. 146, 150 (E.D.N.Y.1988), *aff'd*, 875 F.2d 857 (2d Cir.) *cert. denied*, 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989); *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). Hence, in order for petitioner to obtain habeas relief on this claim, he must first demonstrate that the trial court in fact erred in its evidentiary ruling and that the error was "so pervasive as to have denied him a fundamentally fair trial." *Collins*, 755 F.2d at 18, *citing, United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). A petitioner will be deemed to have been "denied a fundamentally fair trial, where the excluded evidence, evaluated in the context of the entire record," would have created a reasonable doubt that did not otherwise exist if it had been admitted. *U.S. v. Agurs*, 427 U.S. at 112, 96 S.Ct. 2392; *Collins*, 755 F.2d at 18; *United States v. Cody*, 722 F.2d 1052, 1062–63 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984).

The first evidentiary ruling concerns the time of arrest. At the Wade hearing, the trial court sustained an objection to defense counsel's question, posed to Officer Anderson, asking for the exact time petitioner was arrested for the June 2nd robbery. This question followed extensive examination of Detective Anderson concerning the events of July 3rd, the date the lineups occurred. The testimony up to this point described that petitioner had participated in several lineups and that after the last lineup, which identified petitioner as the person who committed the February 22nd robbery, petitioner was formally placed under arrest at 5:10 p.m. When defense counsel attempted to inquire

whether petitioner was arrested at a different time for the robbery of June 2nd, the prosecutor's objection was sustained on the grounds of relevance.

Defense counsel argued below, that the time of arrest was relevant to whether petitioner was in custody on the day of the lineups and that she *"assumed she was permitted to question on probable cause."* (T.135–136). Understanding the issue to be probable cause, the prosecution correctly countered that probable cause for the arrest was established long before the lineups took place when the witness Bailey identified petitioner in a photo spread, and that the exact time of arrest would have more significance if the prosecution had obtained incriminating post arrest evidence from the defendant, which it did not. (T. 135–136).

The petitioner now essentially argues, although this was not clearly presented below, that these questions should have been permitted because they were relevant to the issue of when his Sixth Amendment rights ripened. In effect, petitioner makes the same argument raised above, that once he was arrested he was entitled to counsel and that the purpose of these questions was to establish the time of his arrest. As discussed above, petitioner is mistaken in his belief that the time of arrest governs the issue of when he would be entitled to counsel at a lineup. Consequently, the questions he sought to have answered were not relevant to the issue presented.

Significantly, the record reflects that petitioner actually obtained the information he sought and suffered no prejudice from the court's ruling. Petitioner states that he sought to establish by his line of questioning "that the defendant was arrested for the specific crime involved in each lineup *when the lineup was completed."* (Appellant's Brief at p. 34). Defense counsel succeeded in securing this exact information when she pursued a similar line of questioning which established that after each witness identified petitioner as the robber, Officer Anderson considered him to be under arrest for that crime. (T.156). Officer Anderson testified to the approximate times when the lineups were conducted, and the line-up sheets (all of which were introduced into evidence) contained the exact time when each identification occurred. (T. 91–92). Moreover, the record reveals that Officer Anderson had already testified that he considered petitioner under arrest for the June 2nd robbery after the identification was made. (T.56,91–92). Defense counsel thus had all the information needed to establish the time of arrest for the June 2nd robbery and was in a position to make any appropriate argument.

■ Petitioner's next claim of error is curious for its distortion of the record. Petitioner argues that the trial court erred when it sustained the prosecutor's objection to questions regarding how the lineup stand-ins were recruited. In what appears to be a misrepresentation of the record, petitioner claims that the trial court also limited questions as to how the lineup *witnesses* were prepared for the lineup. Petitioner cites no specific page reference in support of this latter claim other than "H81 et seq". (Appellant's Brief at 36.) The record, however, clearly demonstrates that the court sustained relevance objections only to questions which inquired into 1)who chose the lineup stand-ins, 2)where the stand-ins were between lineups, and 3)whether the stand-ins were paid. (T. 82–83, 95). None of these questions were pertinent to the issue of whether the lineup was suggestive and were properly excluded.

Contrary to the assertion that the trial court limited examination concerning the witnesses, the record reflects that defense counsel was permitted to freely question Officer Anderson about the witnesses and their contact with police personnel and each other. (T.83–157). In addition to what was elicited by defense counsel, the direct examination of the prosecutor is replete with questions concerning contact with the witnesses. (T. 13–76). This court could find nothing in the record to support petitioner's claim that he was prevented from conducting an examination about the witnesses. Accordingly, since petitioner has failed to meet the threshold showing that the trial court's rulings were erroneous, or excluded relevant evidence, it is not necessary to consider the impact this evidence would have had on petitioner's trial.

*E. JURY CHARGE:*

Petitioner claims that "the trial court erred when it entered a verdict for robbery in the first degree" at the June trial, since if he "was guilty at all it should have been for robbery in the second degree." The court construes petitioner's claim as follows: 1) that there was not sufficient evidence adduced at trial to charge the jury as to robbery in the first degree and 2) that the trial court erred when it both dismissed the second degree robbery count under Indictment No. 1135–84 and failed to charge the jury as to the elements of this charge.

 "Errors in a state court's jury charge are questions of state law, and therefore not reviewable on federal habeas corpus, absent a showing that the jury charge deprived the defendant of a federal constitutional right." *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990); *McEachin v. Ross,* 951 F.Supp. 478, 483–84 (S.D.N.Y.1997). The standard of review of state jury instructions in a habeas petition is "not whether the instruction is undesirable or erroneous or even universally condemned, [but whether] the ailing instructions by itself infected the entire trial so that the resulting conviction violates due process." *Wright v. Smith,* 569 F.2d 1188, 1191 (2d Cir.1978), *quoting, Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

Prior to charging the jury, a charging conference was held with both counsel in the trial judge's chambers. (T.523–546). Petitioner had been charged with robbery in the first and second degree for the Shell robbery and first degree robbery for the Texaco robbery. At the conference, petitioner's counsel requested a lesser charge of robbery in the third degree on all counts pending. She argued that "it ha[d] to do with the affirmative defense by the defendant. The fact that if a gun isn't loaded it is an affirmative defense." (T. 538–539.). Judge Weissman correctly noted that the law required the defendant to come forward and present evidence of this affirmative defense, to which defense counsel conceded: "In light of the fact in the charge that you talked about this morning regarding display of a weapon, there's been no evidence presented as far as [an] affirmative defense. I really don't know how applicable it is." (T.539).

 After further discussion, the court concluded that a reasonable view of the evidence did not warrant that the jury be charged on the affirmative defense. (T.543). The prosecution then moved to dismiss the charge of robbery in the second degree for the June 2nd Shell robbery, arguing in support of its application that "this count could be properly charged if the defendant had presented evidence that the weapon was not loaded." (T.629–630). In the absence of such testimony the prosecution argued that robbery in the first degree was the proper charge.[13] Petitioner's counsel did not oppose this motion. *Id.* The court granted the motion (T.630) and charged the jury on robbery in the first degree for both the June 2nd Shell and the Texaco robberies. The jury found petitioner guilty as charged on both counts. (T.633).

 Here, both the trial court's charge, which instructed the jury on robbery in the first degree, and the court's dismissal of the second degree robbery charge were proper. Under New York's Penal Law a person is guilty of robbery in the first degree when:

---

13. While "displaying what appears to be a firearm" during a robbery is an element of both robbery in the first and second degrees under N.Y. Penal Law sections 160.15(4) and 160.10(2)(b), respectively, the prosecution has the discretion to charge either degree of the crime. *See, People v. Eboli,* 34 N.Y.2d 281, 357 N.Y.S.2d 435, 313 N.E.2d 746 (1974); *United States v. Pedroza,* 750 F.2d 187 (2d Cir.1984) ("what charge to file ... [is a] decision[ ] that generally rests in the prosecutory's discretion" ....), *citing, United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). The distinguishing feature which mitigates the severity of the first degree offense is the affirmative defense expressly contained in section 160.15(4). See, Baskerville, 60 N.Y.2d at 380–81, 469 N.Y.S.2d 646, 457 N.E.2d 752; See also, N.Y. Penal Law § 160 (McKinney's Practice Commentaries at 191). Once the people have met their burden under robbery in the first degree, the defendant has the burden of proving that the firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious injury could be discharged. Where the defendant proffers evidence to support the affirmative defense, it is proper to charge the jury on the lesser count of robbery in the second degree.

[H]e forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: . . .4) displays what appears to be a pistol, revolver or other firearm . . . except that in any prosecution under this subdivision, it is an affirmative defense that such pistol . . . was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged.

N.Y. Penal Law § 160.15(4). Furthermore, "[i]nducing in the mind of a robbery victim through any one or more of the five senses . . . the belief that firearm ready to be used constitutes a sufficient display of a firearm within the fair intendment of the statute and an aggravating circumstance justifying a conviction for the crime of robbery in its highest degree." *People v. Cotarelo*, 129 A.D.2d 725, 514 N.Y.S.2d 489, 489 (2d Dept' 1987), *aff'd*, 71 N.Y.2d 941; 528 N.Y.S.2d 816, 524 N.E.2d 137 (N.Y.1988), *citing*, N.Y. Penal Law § 160.15(4)).

 The trial record amply supported the court's decision to charge the jury as to robbery in the first degree at the conclusion of the June trial. Meenahan had testified that the petitioner held a knife to his stomach while he took money from the Texaco station's cash drawer. (T.418, 435–6). Ford testified that he remembered the perpetrator "standing there with his hand in his jacket," (T.312–13) and although he actually did not see a gun, he saw "a bulge," and that it "looked like there could be a gun in there." (T.313,334). Moreover, Young testified that when the perpetrator put his hand in his pocket, he pointed something towards her, (T.371–72) and that it "looked like a gun." (T.360). Young also claimed that after the perpetrator asked "Who has the money?," he threatened that if he did not get the money "he'd start shooting." (T.348). According to Ford, when he told the perpetrator he did not have any money, the robber proceeded to the cashier booth, opened up the cash drawer and started taking money. (T.348). It was later discovered that approximately $60.00 was missing from the case drawer. (T.394). This evidence was clearly sufficient to support the court's charge to the jury on robbery in the first degree.

Petitioner also appears to argue that the trial court erred by not charging the jury as to the affirmative defense of robbery in the second degree. Although "a failure to charge the jury of an affirmative defense constitutes reversible error," *Davis v. Superintendent, Napanoch Correctional Facility*, 1990 WL 160883, No. 89 CV 5760 (Oct. 13, 1990 S.D.N.Y.), *citing, People v. Watts*, 57 N.Y.2d 299, 456 N.Y.S.2d 677, 442 N.E.2d 1188 (N.Y.1982), "where no reasonable view of the evidence would support a finding of the tendered defense, the court is under no obligation to submit the question to the jury." *Id.* In New York, "a defendant is entitled to a charge on the affirmative defense to robbery in the first degree when there is sufficient evidence for a jury to find by a preponderance of evidence that the object displayed was not a loaded weapon capable of producing death or serious physical injury." *People v. Deboue*, 234 A.D.2d 558, 652 N.Y.S.2d 296, 297 (2d Dep't 1996), *citing, People v. Gilliard*, 72 N.Y.2d 877, 532 N.Y.S.2d 358, 528 N.E.2d 510 (1988). It is incumbent, however, upon the defendant to prove that the subject weapon was unloaded or inoperable, *People v. Cotarelo*, 514 N.Y.S.2d at 489, *citing, People v. Baskerville*, 60 N.Y.2d 374, 380, 469 N.Y.S.2d 646, 457 N.E.2d 752; *People v. Brown*, 108 A.D.2d 922, 923, 485 N.Y.S.2d 812, 813 (2 Dept. 1985), and where the record is devoid an any evidence that the object concealed was an unloaded or inoperable weapon, petitioner would have needed to testify in order to prove the affirmative defense. *Jennings v. Strack*, 1994 WL 163944, No. 93 CV 1681 at *4 (Apr. 25, 1994, S.D.N.Y.).

Viewing the entire record in the light most favorable to the petitioner, see *Watts*, 57 N.Y.2d at 301, 456 N.Y.S.2d 677, 442 N.E.2d 1188, the record was devoid of any evidence from which a jury could have concluded that the weapon was inoperable. This fact was conceded by both trial counsel. The trial judge's decision to not to charge on robbery in the second degree was proper. Thus, this ground for habeas relief is rejected.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that the district court DENY this petition for a writ of habeas corpus.

Any objections to this report must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal this Court's Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Frank v. Johnson*, 968 F.2d 298 (2d Cir.1992); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).