**Frankie Lee UNDERWOOD, Petitioner,**

v.

**Walter KELLY, et alia, Respondents.**

**No. CV–87–3050.**

United States District Court,
E.D. New York.

July 26, 1988.

Frankie Lee Underwood, pro se.

Elizabeth Holtzman, Dist. Atty. of Kings County, Brooklyn, N.Y., by Richard J. Cutler, for respondents.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

Petitioner, Frankie Lee Underwood, currently an inmate at the Attica Correctional Facility, petitions for habeas corpus relief under 28 U.S.C. § 2254. Petitioner was sentenced to two concurrent terms of imprisonment of 11 to 22 years on April 15, 1983, following a jury trial during which he was found guilty of robbery in the first degree (NYPL § 160.15), and criminal possession of stolen property in the third degree (NYPL § 165.40). On April 21, 1986, the Appellate Division, Second Department, unanimously affirmed petitioner's conviction without opinion. *People v. Underwood*, 119 A.D.2d 778, 501 N.Y.S.2d 404 (2d Dep't 1986). On June 23, 1986, the New York Court of Appeals denied petitioner leave to appeal. *People v. Underwood*, 68 N.Y.2d 673, 505 N.Y.S.2d 1039, 496 N.E.2d 697 (1986).

Petitioner seeks habeas corpus relief based on the same four grounds that he raised on appeal in the state court: (1) insufficiency of evidence to support a verdict of guilt beyond a reasonable doubt because the complainant's identification of the petitioner was unreliable, (2) denial of due process and a fair trial because the court's erroneous *Sandoval* ruling, which would have permitted impeachment during cross-examination, denied the petitioner of any meaningful opportunity to testify, (3) deprivation of the petitioner's due process rights to a fair trial because the court impermissibly pressured the jury into returning a verdict, and (4) the abuse of the court's discretionary powers in sentencing the petitioner because the 11 to 22 year sentence "bordered" on cruel and unusual punishment.

The evidence introduced at trial establishes the following relevant facts. On November 21, 1981, at approximately 11:00 p.m., Kelly James, a pre-med junior at New York University, was returning home from the university library. James had walked several blocks after leaving the Kosciusko train station in Brooklyn when, from be-

hind, a black man, who James later told police appeared to be 20–22 years old, 5′9″, and 130–135 pounds, and who the jury found was petitioner, approached him and pointed a gun at his head and threatened to "pop" James if he resisted. A silky cloth was draped over petitioner's face, thus forming a mask. At this point, James' attention was principally focused on the small black gun.

The masked man pulled James into an alley forming the side entrance of a junior high school. Here, the light was faint, but James testified that he could see and "make out colors." The robber then proceeded to frisk James, who stood against a fence with his arms extended out. When the robber found James' wallet, which contained $25, he took it. Next, still masked and pointing his gun, the robber then directed James to lie face down on the pavement, and the frisk continued.

James was then told to stand. The masked man removed James' black down ski jacket with his free hand. Now, for the first time, the two stood face-to-face, and James took notice of the man's body and clothes. For a second or two, as the man pulled two chains off James' neck, James, from a distance of 18 inches to 2 feet, saw his face without the mask. At trial, James testified that the face he saw that night was that of the petitioner.

A few seconds later, the man ordered James down a staircase at the side of a school, telling him to stay there or he would shoot. The robber then left, carrying James' jacket, jewelry, wallet, and school bags that had been on the ground ever since the man had pulled them away from James at the beginning of the episode. The two bags contained books, clothing, and a calculator. James waited 30 seconds and then ran home.

When James arrived home, he told his mother about the incident, and the two of them went to the local precinct. James described the man to a police officer who was responsible for making a report. Although he did not describe any facial features, save skin color and a mustache, he described the perpetrator as noted above.

On cross-examination, James testified that he had not described the man's clothes at the station house, despite the fact that he could still clearly recollect the perpetrator's clothing at the time of trial.

James looked through seven or eight books of mug shots but did not recognize anyone. Although at the time of James' perusal a 1979 mug shot of the petitioner existed in a book retained at the station house, James either never saw the book containing Underwood's photograph or failed to recognize it. Officer Johnson testified that he could not be sure that James saw the book containing petitioner's photograph that night.

"THE WITNESS: I couldn't say if he looked in that book. I gave him a—he sits down at a desk. There's books laying there. Sometimes that book could be in the draw [sic]. It might be in the other room. It's a possibility another detective had the pictures out like I have them out now. I couldn't exactly say if he looked at that book in particular." Tr., at 137.

However, five months later, on the morning of April 22, 1982, while going to school, James recognized petitioner, wearing his stolen jacket, sitting on a bench at the same train station that James had left a few minutes before the robbery. He walked by the petitioner, watched him, and then followed him onto the train. He lost sight of him when the train went out of service at the next stop.

The next morning, James spotted petitioner standing in the same station, again wearing his jacket. James told two nearby police officers that petitioner had robbed him in the past and was now in the subway station. The two officers then made the arrest.

A *Sandoval* hearing was held on February 16, 1983, pursuant to the petitioner's motion to preclude the use of his criminal record for the purposes of impeachment. The court granted the motion to preclude cross-examination on a 1977 conviction for shoplifting and 1981 robbery charges, which were dismissed when the complainant failed to appear. However, cross-ex-

amination concerning petitioner's 1979 robbery conviction, for which he was on parole when he was arrested for the instant offense, was not precluded. Over petitioner's objection on the ground that the crimes were too similar, the court ruled that the prosecutor could ask him if he had previously been convicted of robbery in the second degree but not about the underlying facts of that conviction.

At trial, James described the stolen jacket with precision. For the exception of the brand name, which he cited as "Impressions" rather than "Progressions," the description matched the jacket recovered from the petitioner, which James claimed he had not seen since the arrest. Additionally, during the trial James tried the jacket on, thereby demonstrating that it fit him. However, James admitted that he could not be absolutely sure it was the same jacket as "it's [like] a lot of jackets out here." Petitioner's appearance also matched James' initial description given to the police and his personal recollection at the time of trial. James also denied drinking or taking drugs prior to the incident.

Petitioner did not testify on his own behalf. The court precluded the use by the prosecution of petitioner's mug shot as an exhibit. The jury heard testimony, however, that it was possible that James was shown a mug shot of the petitioner and that one existed.

The jury began its deliberation at 4:40 p.m. on February 22, 1983, after being instructed on (1) robbery in the first degree, (2) petit larceny, and (3) criminal possession of stolen property in the third degree. At 6:15 p.m., the jury asked to see a copy of the complaint report and for a read-back of part of Kelly James' testimony and that of one of the police officers. The request was complied with by the court, and the jury resumed its deliberations at 6:25 p.m. At 6:45 p.m., the jury entered the courtroom after its request to hear James' testimony regarding the period of time from when he was approached by the gunman to when he was told to go down the steps.

The judge offered the following response to the jury's request:

"[I]t will take about an hour to read that back to you. Originally, my plan was by seven o'clock to send you for the night to the hotel and to resume your deliberations in the morning. If you wish, we can read this back now or if you want we can read it back tomorrow morning." Tr., at 228.

After a small portion of the requested testimony was then read back by the reporter and the foreman signaled that the needs of the jury had been satisfied, the judge and foreman had the following exchange:

"THE COURT: As I said, I planned to send you now to the hotel for dinner and the night and then you can resume your deliberations in the morning. You may go then.

"THE FOREMAN: It is possible to deliberate for another ten minutes?

"THE COURT: Why don't you do that. Deliberate for another ten minutes."

The jury retired at 6:55 p.m. Five minutes later, the jury returned to the courtroom and offered a verdict of guilty on counts 2 and 3.

On April 15, 1983, the court sentenced the defendant as a second felony offender to concurrent terms of 11 to 22 years on the robbery count and one year on the stolen property count. Petitioner was at the time of the incident on probation for robbery in the second degree, a crime for which he received 1½ to 4½ years after pleading guilty. He also had pled guilty to trespass, for which he received a conditional discharge.

The sentencing judge cited petitioner's refusal to speak to the probation department about the instant crime, the traumatic experience suffered by James, and the number of robberies that have "plagued" New York City before entering his judgment.

## DISCUSSION

Petitioner argues that he was convicted on evidence that was not sufficient to support a verdict of guilt beyond a reasonable doubt. He asserts that, because of

poor lighting, the short period of petitioner's facial exposure, and the stress that James must have felt, James could not have possibly made a reliable identification. Petitioner also notes that, when James made the initial identification, five months had elapsed since the crime had taken place. Equally as important, he claims, is the possibility that the accusation may have been based solely · on the fact that petitioner was wearing a jacket that resembled James' jacket.

The constitution prohibits criminal conviction of any person except when there is proof of guilt beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). However, the question in this case is what standard is to be applied in federal habeas corpus cases. The Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), has answered this question. In a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 "the applicant is entitled to habeas corpus relief if it is found that upon the record of evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson, supra,* at 324, 99 S.Ct. at 2791–2792. A modicum of evidence will not suffice to support the constitutionality of the verdict. *Jackson, supra,* at 320, 99 S.Ct. at 2789. *Soto v. LeFevre,* 651 F.Supp. 588 (S.D.N.Y.1986), *aff'd,* 812 F.2d 713 (2d Cir.1987).

Here, viewing the evidence in a light most favorable to the prosecution, *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. at 2789; *People v. Malizia,* 62 N.Y.2d 755, 476 N.Y. S.2d 825, 465 N.E.2d 364, *cert. denied,* 469 U.S. 932, 105 S.Ct. 327, 83 L.Ed.2d 264 (1984), it is clear that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. James, a pre-med student, did have the opportunity to view the perpetrator's face and body and hear the perpetrator's voice. The fact that he did not recognize petitioner in any of the mug shot books is not dispositive because the responsible police officer testified that he may not have shown James the book containing petitioner's photograph. Nor did the fact that

James never described the perpetrator's face, except as to the color and the presence of a mustache, or the perpetrator's clothing to the police require petitioner's acquittal. James never told the police that his knowledge of petitioner's identity was limited to the details he was able to describe.

Furthermore, 28 U.S.C. § 2254(d) precludes federal courts in habeas proceedings from re-evaluating a witness' credibility. *Marshall v. Longberger,* 459 U.S. 422, 432–35, 103 S.Ct. 843, 849–51, 74 L.Ed.2d 646 (1983). James asserted that the petitioner was the perpetrator and that the jacket was his jacket.

Once the jury has made its decision, a federal court cannot disturb these findings of fact because it would have drawn different inferences from the evidence. It must review the evidence in a light most favorable to the prosecution. *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. at 2789. Thus, here, the court must assume, as the jury did, that James was telling the truth. Clearly, under this assumption, there is much more than a modicum of evidence to support petitioner's conviction. *Jackson, supra,* at 320, 99 S.Ct. at 2789.

For the same reason, the jury's findings on the third count, possession of stolen property, will not be disturbed.

■ Petitioner further contends that the court's pretrial *Sandoval* ruling deprived him of a fair trial. At the pretrial hearing, the court ruled that, if the petitioner chose to testify on his own behalf, the prosecutor could ask petitioner if he had previously been convicted of robbery in the second degree, provided he did not question petitioner regarding the underlying facts that gave rise to that conviction. The petitioner never took the stand.

■ Generally, erroneous evidentiary rulings by a state trial court do not constitute a basis upon which a writ of habeas corpus can be issued. *Jenkins v. Bara,* 663 F.Supp. 891 (E.D.N.Y.1987); *Mitchell v. Smith,* 481 F.Supp. 22, 25 (E.D.N.Y. 1979), *aff'd,* 633 F.2d 1009 (2d Cir.1980). The admission of prior convictions for the

purpose of impeaching a defendant is thus not redressable in a federal habeas corpus proceeding unless there is a showing that the particular errors were of a constitutional magnitude. *Jenkins, supra,* 663 F.Supp. 891.

Petitioner makes no allegations of constitutional dimensions other than a broad due process claim. Essentially, petitioner questions the court's application of the *Sandoval* doctrine to the facts of his case. Thus, petitioner questions of the decision to permit impeachment because the jury may have used his prior conviction to establish guilt by propensity. Petitioner also contends that, by effectively precluding him from taking the stand, the judge deprived him of his only source of material evidence. However, these are only some of the factors that a judge should consider when determining whether a defendant's prior criminal record should be admitted for purposes of impeachment. *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974). The trial judge should also consider the probative value of the conviction on the issue of credibility. *Sandoval, supra.* The weight of various factors and the ultimate decision to admit or not to admit is within the wide discretion of the trial court judge.

In all events, in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the Court characterized a ruling under Federal Rule of Evidence 609(a) as "not reaching constitutional dimensions" and noted that, for a defendant to preserve the issue of admissibility for review, he must actually testify; otherwise, any harm that a defendant faced is purely speculative. Here, the defendant never testified. There is therefore no way of knowing whether the petitioner would have testified but for the ruling, lied on the stand, or encountered the prejudice from the court's ruling he fears. Accordingly, petitioner's second ground for relief fails.

■ Petitioner contends in his third claim for relief that the jury's deliberations were improperly curtailed by the court. As noted above, the judge expressed his desire, after the jury returned to the court-room for a read-back, that the jury retire to the hotel for the evening and return the next morning. The foreman then requested that the jury be given another ten minutes to deliberate, a request that was granted. Five minutes later, the jury returned with a verdict. Petitioner claims that the judge coerced the jury into a premature decision by threatening protracted deliberations and a night spent at a hotel.

■ New York has adopted a contemporaneous objection rule requiring that an objection to jury instructions must be lodged at trial in order for it to be raised on appeal. This procedural default doctrine also governs the availability of federal habeas corpus relief. *Rosenfeld v. Dunham,* 820 F.2d 52 (2d Cir.1987).

In *Wainwright v. Sykes,* 433 U.S. 72, 87–89, 97 S.Ct. 2497, 2506–2507, 53 L.Ed.2d 594 (1977), the Court ruled that failure to comply with a state's procedural rule for raising a constitutional claim is an independent and adequate state ground of decision sufficient to preclude federal review of the claim unless the party can show cause for the procedural default or prejudice resulting from the violation. More specifically, the Court in *Wainwright* adopted the actual prejudice standard as stated in *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

■ Thus, this Court can review the petitioner's claim only if he has shown actual prejudice. As a general rule, the length of time of jury deliberations is a matter of trial court discretion. Mere length of time cannot constitute coercion resulting in prejudice. *United States v. White,* 589 F.2d 1283, 1291 (5th Cir.1979); *United States v. Minieri,* 303 F.2d 550, 556 (2d Cir.1962). In *United States v. White, supra,* a deadlocked jury requested a recess. The judge denied this request, and five minutes later the jury returned a verdict of guilty on all counts. No prejudice or coercion was found. Similarly, an instruction to continue deliberations on a hot Friday night, without proper dinner, was held not coercive. *United States v. Saunders,* 641 F.2d 659 (9th Cir.1980).

New York courts have followed this approach. In *People v. Lewis,* 71 A.D.2d 7, 422 N.Y.S.2d 380, 383 (1st Dep't 1979), the jury was told that it would be kept over for a second night if it had any more questions. The court found that the possibility of sequestration for a second night did not have a "chilling effect" on the jury's deliberation and that the defendant's claim of coercion was "purely speculative." The cases in which the New York courts have found prejudice or coercion generally encompass situations where the jury states that it is deadlocked, and then, a few minutes after the judge's "threat" of sequestration, the jury returns a unanimous verdict. *People v. Mabry,* 58 A.D.2d 897, 397 N.Y.S.2d 7 (2d Dep't 1977); *People v. Henry,* 56 A.D. 2d 610, 391 N.Y.S.2d 643 (2d Dep't 1977); *People v. Hill,* 44 A.D.2d 813, 355 N.Y.S.2d 612 (1st Dep't 1974). In *People v. Carter,* 40 N.Y.2d 933, 389 N.Y.S.2d 835, 358 N.E. 2d 517 (1976), after a verdict had been discovered not to be unanimous, the jury returned a unanimous verdict several minutes after being told they would have to stay another night.

These cases are distinguishable from the present case. For a jury to return a verdict several minutes after it declares that it is hopelessly deadlocked indicates that the judge's supplemental charge influenced the jury. When the charge, for all intensive purposes, is that the jury will be sequestered, then there is actual prejudice to the defendant. However, in the present case, and in *People v. Lewis, supra,* they simply wanted questions answered. In this situation, it is highly speculative as to whether the jury was pressured into a decision because it is entirely possible that the jury was on the verge of unanimous agreement and just needed a few points clarified. The jury in petitioner's case asked for another ten minutes to deliberate. In a situation where agreement is near, ten minutes of deliberation does not indicate coercion. In contrast, when a jury is deadlocked after hours, perhaps days, of deliberations, a sudden decision ten minutes later indicates prejudice.

■ Petitioner does not offer cause for his procedural default. Therefore, this exception to the *Wainwright* bar to review is not applicable.

It is true that, if the appellate division addresses the issue on the merits, despite procedural default, the federal courts on habeas review should show no more respect for the contemporaneous objection rule than did the state courts.

The appellate courts may sidestep NYCPL § 470.05(2) when the interests of justice overwhelm the procedural default. NYCPL § 470.15(6). However, unless the appellate court explicitly states that it has reviewed the claim on the merits in the interests of justice, it is assumed that the court applied the contemporaneous objection rule when facing procedural default. *Martinez v. Harris,* 675 F.2d 51, 54 (2d Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982). Thus, when the appellate division affirms a conviction without opinion, as in the present case, federal court must assume that the state courts have not addressed the issue on the merits, and the *Wainwright* rule controls habeas corpus review. *Martinez, supra.*

■ Petitioner also claims that his sentence is "unduly harsh and excessive." He emphasizes his youth, prior criminal record, and absence of physical injury inflicted upon the victim. This Court does not believe that petitioner's claim presents a constitutional issue.

■ Petitioner's 11 to 22 year sentence is within the range of years prescribed by law and is actually below the maximum allowable by law. When a sentence is within this range, a claim of excessive punishment does not present a constitutional question necessary for habeas corpus reversal. *Castro v. Sullivan,* 662 F.Supp. 745, 753 (S.D.N.Y.1987); *Rivera v. Quick,* 571 F.Supp. 1247 (S.D.N.Y.1983). Petitioner's fourth and last ground for reversal fails.

For the reasons set forth above, petitioner's application for writ of habeas corpus is denied.

The Clerk is directed to enter judgment dismissing the complaint and to mail a copy of the within to all parties.

SO ORDERED.