**Wade FRAZIER, Petitioner,**

**v.**

**State of NEW YORK, Respondent.**

**No. 01 CIV. 4541(RWS).**

United States District Court,
S.D. New York.

Jan. 28, 2002.

Wade Frazier, Sing Sing Correctional Facility, Ossining, NY, Pro Se.

Honorable Eliot L. Spitzer, Attorney General of the State of New York, New York City, By Bernadine Agocha, Assistant Attorney General, Of Counsel, for Respondent.

## OPINION

SWEET, District Judge.

Wade Frazier ("Frazier"), an inmate at the Sing Sing Correctional Facility, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254, to challenge the April 16, 1997 judgment of the Supreme Court, New York County (Brandveen, J.), convicting him, after a jury trial, of Robbery in the First Degree in violation of New York Penal Law § 160.15(3), and Robbery in the Second Degree in violation of New York Penal Law § 160.10(2)(a), as violative of the United States Constitution. For the reasons stated, the petition is denied.

### Prior Proceedings

The petition was filed by Frazier on May 29, 2001, alleging numerous grounds for relief including that the lineup by which he was identified was unduly suggestive. The state moved to dismiss his petition which motion was marked fully submitted on September 20, 2001.

### The State Proceedings

#### A. Indictment and Pretrial Hearings

Frazier was arrested on August 23, 1996 and subsequently indicted on one count each of Robbery in the First Degree in violation of New York Penal Law § 160.15(3), and Robbery in the Second Degree in violation of New York Penal Law § 160.10(2)(a).

On April 7, 1997, the defense moved to suppress, inter alia, any and all testimony regarding the identification of Frazier on grounds that the identification procedure used by the prosecution in this case was unduly suggestive and that the prosecution witness lacked independent basis for an adequate in-court identification. A Wade [1] hearing was held on April 7, 1997. There Frazier argued that the lineup was impermissibly suggestive because the participants in the lineup were dramatically dissimilar in appearance from him. Frazier claimed that he was the only participant with readily identifiable dreadlocks and that the police failed to take measures to cover Frazier's distinctive hairstyle. The Honorable Justice Antonio Brandveen denied the defense motion, ruling that the lineup identification was not unduly sug-

---

1. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

gestive since an examination of photographs of the lineup shows that Frazier's appearance was sufficiently similar to that of other participants in the lineup. The judge also denied Frazier's request to call additional witnesses at the hearing.

## B. *The Trial*

On April 9, 1997, Frazier's trial began before Justice Brandveen and a jury. During jury selection, the trial court granted the People's objection made pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to a defense peremptory challenge. At trial four people testified for the prosecution and the trial court permitted an in-court identification of Frazier by the victim Zakkour.

The evidence offered by the defense at trial included the testimony of Dr. Leippe, a psychologist, called as an expert on eyewitness testimony, defense investigators Leah Gonzalez and Odetta Carberry, and Ishmael Wallace. Wallace, who was at the park during the robbery, testified that Frazier was not the individual he observed attack Zakkour. According to Wallace, the perpetrator, unlike Frazier, was a "light skinned black male," or "could be Latino," approximately "five feet, six inches and three-quarters" in height, with "unkempt" and "matted hair." However, Wallace, who has a history of mental illness and is unable to distinguish between "fantasy and reality," could not form "a clear mental image" of the person he observed attack Zakkour. Wallace also admitted that he sometimes doubts his own memory and finds it difficult to accept his memory with his "rational mind." At the time of the robbery, Wallace was under medical treatment and was taking two or three forms of psychotropic drugs.

Two police officers, Bernadette Fee and Jerry Mami, also testified for the defense.

Although the defense attempted to impeach Zakkour's credibility by highlighting alleged discrepancies in her identification of Frazier and the officers admitted error in their notes of conversations with Zakkour. At trial, Officer Fee testified that her notes were not a verbatim transcription of Zakkour's statements immediately following the crime and that she paraphrased much of what Zakkour had said. Additionally, Zakkour never reviewed what the officers wrote and was not asked to correct any discrepancies.

## C. *Conviction and Sentence*

On April 16, 1997, the jury returned a verdict convicting Frazier of both counts charged in the indictment. Frazier was sentenced as a second felony offender to concurrent terms of twenty years in prison for the First Degree Robbery Count and ten years in prison for the Second Degree Robbery Count.

## D. *State Appeal*

Frazier appealed his conviction to the Appellate Division, First Department, claiming that: (1) his conviction was against the weight of the evidence; (2) that the lineup was unduly suggestive and the victim should not have been permitted to make an in-court identification; (3) the trial court improperly seated a juror whom defense counsel had peremptorily challenged; and (4) that the trial court abused its discretion at sentencing by improperly relying on Frazier's lack of remorse as justification for its imposition of a harsh and excessive sentence.

On April 4, 2000, the Appellate Division affirmed Frazier's conviction. The appellate court held that Frazier's conviction was not against the weight of the evidence. The court found that Frazier's lineup identification was not unduly suggestive and that the trial court properly precluded

Frazier from calling additional witnesses at the *Wade* hearing. The court further ruled that the trial court properly granted the prosecution's objection to the defense peremptory challenge. As to Frazier's claim regarding sentencing, the appellate court found no abuse of discretion. *People v. Wright,* 270 A.D.2d 213, 706 N.Y.S.2d 29, 30 (App.Div. 1st Dept.2000). The Court of Appeals denied leave to appeal on May 18, 2000.

### Facts

Frazier's conviction stems from the robbery of Elizabeth Zakkour ("Zakkour") on the afternoon of August 13, 1996, in Central Park. At trial, the prosecution presented evidence showing that at the time of the crime Zakkour was standing near a bench by the 97th Street and Fifth Avenue park entrance, waiting for her infant daughter and the babysitter. The weather was clear, and it was still daylight. Zakkour testified that when she went to sit down on the bench she heard a rustling sound which seemed to be coming from behind the bench. Zakkour thought that there was a rat under the bench but when she turned around to investigate, she was struck across the back of her head, and she fell to the ground. Zakkour initially fell on her hands and knees, tearing her denim trousers on the cement pavement. However, due to the force of the impact, she slipped and landed on her back. When she looked up she saw her attacker standing behind the bench, "looking directly at [her]."

Zakkour further testified that she was lying approximately six feet from where the assailant stood. Zakkour noticed that he was about six feet tall with a muscular build, wearing a faded, khaki, brownish green t-shirt that had a circular pattern on it. She also testified that she saw he had a full beard around his lips, and a prominent brow bone, thick black lashes, very long, almond shaped eyes, alternating dreadlocks, the longest being about shoulder length. The assailant grabbed her hands and purse and began banging her head against the cement. He then ran off with her purse. Zakkour testified that the robbery lasted about two to three minutes, though that time-frame was called into question in light of the circumstances surrounding the robbery. Though there were conflicting indications in police reports, Zakkour said she remained conscious and continued staring directly into Frazier's face during this entire time.

Following the robbery, an individual named Ishmael Wallace ("Wallace") approached Zakkour and asked if she was all right. Wallace was in the park at the time of the robbery and was seated on a bench when he heard Zakkour screaming. Wallace turned and saw a man come over the back of the bench and push Zakkour to the ground. Wallace was some distance away from the incident and did not have a good mental image of Zakkour's assailant. Wallace did, however, observe the assailant while he was bent over the woman and as the individual was running away.

Other passersby soon approached Zakkour and accompanied her to a nearby hospital. Zakkour had a deep laceration on her skull and was covered in blood. As she walked from the park to Mt. Sinai Hospital she felt "very shaky," and "quite faint." At the hospital, Zakkour was treated by Dr. Michael Ramon Goy. While examining Zakkour, Dr. Goy noticed that one of the emergency room nurses (the "triage nurse"), had written "LOC" or "loss of consciousness" on Zakkour's chart. However, when Dr. Goy asked Zakkour if she was unconscious during the robbery she responded "no." Dr. Goy also found that despite having undergone a very traumatic experience, Zakkour was not hysterical and her mental state appeared normal. In

addition, Zakkour's vision was not impaired by the blows to her head.

Several police officers interviewed Zakkour at the hospital on the day of the robbery and Zakkour consistently described her assailant to the officers as "approximately twenty to thirty years old, six feet tall, thin but muscular, alternating length dreadlocks, similar to that worn by singer Tracy Chapman, the longest one being sort of chin to shoulder length and shorter ones towards the top." Zakkour did not mention Frazier's eyes, prominent brows and facial hair during the initial description of the perpetrator to the police. However, later when police officers specifically asked Zakkour if the perpetrator had facial hair she stated that he had a full beard.

Later that night, Zakkour was again contacted by two police detectives and asked to view a photo array. Although one of the detectives interviewing Zakkour wrote in a report that "the victim did not think she could identify the perpetrator by photos," Zakkour denies ever making this statement to police. Zakkour was unwilling to go to the precinct and view the photo array at that time because her head was covered in dried blood and her doctors advised her not to wash her hair for five days.

On August 22, 1996, nine days after the robbery, Officer George Lippi, while seated in the passenger's seat of an unmarked police vehicle, observed Frazier coming out of the Fifth Avenue and 97th Street exit of Central Park. Officer Lippi recognized Frazier from police radio broadcasts which described the perpetrator of the Zakkour robbery as "a male black, approximately twenty to thirty years old, six foot, 175 pounds, dreadlocked hair [and] a full beard." When Officer Lippi first observed Frazier, he was struck by his close resemblance to the radio description and by the

fact that Frazier was standing just outside of the park from where the original incident took place. Officer Lippi asked the driver to slow down and go around the block. As the vehicle approached the park on 96th Street, Officer Lippi saw Frazier walk from the side of the street that was well lit into one of the only dark spots on the sidewalk until the officers approached him. Officer Lippi detained Frazier at the park while another officer, Detective Adrian Jones from the Central Park Precinct, contacted Zakkour by telephone and asked her for a brief narrative of the robbery, as well as another description of the perpetrator. After speaking to Zakkour, Detective Jones went to the area of the park where Frazier was being detained. There Detective Jones observed that Frazier not only matched the description provided by Zakkour that morning, but he also fit the description on the police report prepared on the date of the robbery, as well as the image on the police "wanted poster."

Frazier was transported to the police precinct where he was placed in a lineup held the following day, August 23, 1996. The lineup was comprised of six individuals, including Frazier. The first filler was a male black with "baby locked hair, facial hair, approximately twenty-seven to twenty-eight years old." The second filler was "a male black approximately twenty-seven, twenty-eight years old. Facial hair, locked hair." Number three was "a male black, with matted dread-like hair, facial hair." Filler number four was "a male black, locked hair, . . . facial hair." The fifth was "a male black, locked hair, facial hair." Frazier was the sixth person in the lineup. Frazier's mugshot and the pedigree information recorded by police upon his arrest depict Frazier as a male black, thirty-six years in age, six feet, one inch in height, weighing 190 pounds, facial hair and long to medium dreadlocks. All of the lineup

participants were seated and none wore distinctive clothing. Despite the descriptions of the fillers as having "locked" hair, or some variation thereof, none had hair that extended more than even a short distance from their heads as Frazier's did and as Zakkour's description indicated.[2]

Later that day officers retrieved Zakkour from her home to view the lineup at the police precinct house. During the drive from her home to the precinct, there was no conversation between Zakkour and the officers regarding the lineup. In addition, she never saw either Frazier or any of the fillers prior to the actual viewing. At the precinct, Zakkour was led into the viewing room by Detective Jones. When Detective Jones pulled up the shade of the viewing window, she asked Zakkour, "do you recognize anyone in the lineup ... If you do, what number is he"? Zakkour looked at each of the individuals in the lineup and when she got to Frazier at number six, she felt immediately apprehensive and stepped away from the viewing glass. Zakkour informed Detective Jones that she recognized Frazier as the man that robbed her in Central Park. Zakkour testified she never had any doubt that she picked the right guy from the lineup and the following day she telephoned Detective Jones to tell the officer that she was certain Frazier was the robber.

Shortly thereafter, two investigators employed by the defense contacted Zakkour and questioned her about her identification of Frazier. When speaking to the defense investigators, Zakkour was unaware that they represented Frazier because they introduced themselves as "court investigators." However, Zakkour informed both

investigators that she would not have identified Frazier at the lineup unless she was "a hundred percent sure" that he committed the crime, and she denied ever having any doubt in her mind as to Frazier's culpability.

### Frazier is Not Entitled to Habeas Corpus Relief

#### A. The Standard for Reviewing State Court Judgments Pursuant to 28 U.S.C. § 2254

■ Section § 2254 of the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") provides a federal remedy for state prisoners if their continued custody is in violation of federal law. Pub.L. No. 104–132, 100 Stat. 1214, *codified at* 28 U.S.C. § 2254(a); *see Chandler v. Florida,* 449 U.S. 560, 571, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981) ("This Court has no supervisory authority over state courts, and, in reviewing a state court judgment, we are confined to evaluating it in relation to the Federal Constitution."). Errors of state law are not cognizable on federal habeas review. *Estelle v. McGuire,* 502 U.S. 62, 71–72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioners bear the burden of proving violations of federal law by a preponderance of the evidence. *See Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997).

Federal habeas courts must presume state courts' factual findings to be correct, 28 U.S.C. § 2254(e)(1), and may not grant relief unless they find that the state court's adjudication of the merits of the claims either:

(1) resulted in a decision that was contrary to, or involved an unreasonable

---

**2.** Many of the mug shots of the fillers show varying lengths of dreadlocks and similar style hair. Those photos were taken at earlier times and at the actual lineup, all of the fillers

had hair styles cut close to the head according to contemporaneous photographs of the lineup.

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

- resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *see Williams v. Taylor,* 529 U.S. 362, 375–76, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Here, Frazier has failed to show that the state court adjudication was contrary to clearly established federal law, that it involved an "unreasonable application" of clearly established federal law, or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### *The Evidence Adduced at Trial Was Sufficient*

■ Frazier first challenges the sufficiency of the evidence presented against him to support a guilty verdict. In *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court ruled that "a state prisoner is entitled to habeas relief only if it is found that upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781. In addition, Frazier "bears the burden of rebutting the presumption that all factual determinations made by the state were correct." *Farrington v. Senkowski,* 214 F.3d 237, 241 (2d Cir.2000).

■ The record in this case, when viewed in the light most favorable to the prosecution, shows that a rational trier of fact could have found Frazier guilty beyond a reasonable doubt of Robbery in the First and Second Degree in violation of Penal Law §§ 160.15(3) and 160.10(2)(a). The prosecutor's evidence at trial established that Frazier forcibly stole Zakkour's handbag by using a dangerous instrument—the cement pavement, and caused her physical injury.

The State's case mainly rests on the eyewitness account of the victim, Zakkour. Although several witnesses testified on Frazier's behalf, attempting to contradict Zakkour, including Wallace, the jury apparently resolved any conflict on the issue of identification in favor of the prosecution. In order to convict Frazier, the jury had to believe that Frazier was the person who robbed Zakkour in Central Park and disbelieve Wallace's testimony that someone other than Frazier committed the crime. This determination is rational on these facts. Zakkour observed the perpetrator at close range for two to three minutes at close range, her eyesight was not impaired, and she never lost consciousness during the robbery. Immediately following the robbery, Zakkour provided police with a description of the perpetrator which closely matches Frazier's appearance.

Wallace, however, appeared unstable and somewhat lost prior to taking the stand at trial. During cross examination, the prosecution was able to cast doubt on his credibility by eliciting testimony that he did not have a clear view of the perpetrator. Wallace also admitted that at times he could not rely on his own memory. In light of his history of mental illness and his admitted inability to distinguish between fantasy and reality, it would not have been irrational for the jury to accept Zakkour's testimony of events over Wallace's.

In *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court ruled that a habeas court must defer to the assessments of the weight of the evidence and credibility of

the witnesses that were made by the jury and may not substitute its view of the evidence for that of the jury by redetermining the credibility of conflicting eyewitnesses.

The evidence in this case, satisfies the due process test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781. The state appellate court decision that the evidence was sufficient to convict Frazier was not contrary to established federal law, nor was it based on an unreasonable determination of the facts. Frazier's conviction was supported by the evidence and it was rational for the jury to resolve conflicts in testimony in favor of the prosecution.

**The Pretrial Identification Procedure Was Unduly Suggestive, But the In–Court Identification Was Not Improperly Admitted Because The Trial Court Did Not Commit a Constitutional Error in Determining it Had Independent Reliability**

█ Frazier also contends that the lineup identification was unduly suggestive because his appearance was dissimilar from that of other participants. According to Frazier, he was the only individual in the lineup matching the victim's description of the perpetrator as, "a black man with alternating length dreadlocks." Frazier contends that the other lineup participants all had hair cut relatively close to the head, while his was chin to shoulder length.

The Second Circuit recently held under similar circumstances that an unduly suggestive lineup is grounds for the granting of a habeas petition. *Raheem v. Kelly*, 257 F.3d 122 (2d Cir.2001) ("Raheem"). In that case, the state trial court made a finding that the lineup was not unduly suggestive, despite the fact that Raheem was wearing a three-quarter length black leather jacket that featured prominently in the witnesses' descriptions and no other participant wore such a jacket. The Ap-

pellate Division affirmed. The New York Court of Appeals declined to entertain the challenge, stating that "[t]he lower court's determination that the lineup was not suggestive involves a mixed question of law and fact which is supported by the record and thus beyond review in this court." *People v. Whitaker*, 64 N.Y.2d 347, 351 n. *, 486 N.Y.S.2d 895, 897 n. *, 476 N.E.2d 294 (1985).

Entertaining a writ of habeas corpus, the district court determined that the pretrial identification of the defendant was unduly suggestive because the defendant was the only person in the lineup wearing a distinctive leather coat which featured prominently in the witness' descriptions. The district court denied the writ on other grounds and the Second Circuit reversed, affirming the district court's determination that the lineup was unduly suggestive, stating that "[a] lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants plainly do not." *Raheem v. Kelly*, 257 F.3d at 134. Similarly, where eyeglasses were "the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police," a lineup in which the defendant was the only person wearing eyeglasses was unnecessarily suggestive. *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir.1975); *see also United States v. Williams*, 469 F.2d 540 (D.C.Cir.) (*per curiam*), *cert. denied*, 409 U.S. 872, 93 S.Ct. 203, 34 L.Ed.2d 123 (1972); *id.* at 547 (opinion of Bazelon, C.J., concurring in part and dissenting in part, and joined in pertinent part by remainder of panel: Where the prior description of the gunman indicated that he did not wear a hat, "[t]he showing in a lineup of four individuals wearing hats, along with a fifth, who was the prime suspect ... and who was bare-

headed was clearly improper and unnecessarily suggestive." (internal quotation marks and footnote omitted)); *id.* at 541–42 & n. 7 (for a witness who had stressed the youth and short stature of the perpetrator, a lineup in which the appellant was one of only two participants who could reasonably be characterized as short, and in which the other short participant was demonstrably much older, was unduly suggestive, for "the differences in physical appearance among the participants in the lineup had the predictable effect of focusing [the witness's] attention on appellant"); *id.* at 541 (majority opinion stating that the lineups described in Chief Judge Bazelon's opinion "would certainly not pass muster" under the principles enunciated in, *e.g., Wade* and *Stovall* ).

In *Solomon v. Smith,* 645 F.2d 1179, 1183 (2d Cir.1981), the Second Circuit found the pretrial identification procedures suggestive where, *inter alia,* an assailant had been described as 5′7″ tall and weighing 145 pounds and a lineup was held in which the defendant, who was 5′6″ tall and weighed 130 pounds, was the only person near that description—all but one of the other participants being four to-six inches taller than the defendant and the remaining participant, though only two inches taller than the defendant, being 65 pounds (*i.e.,* 50%) heavier.

Here, despite the police description of the lineup participant having "locked hair" and "dreadlocks", none of the hairstyles of the participants were similar to Frazier's. Frazier was the only participant who had alternating-length dreadlocks, and this hairstyle was the only consistent, distinctive feature in Zakkour's various descriptions. The lineup photographs submitted as an exhibit to the government's papers reveal that none of the participants had hairstyles that resemble Frazier's. Although several of the participants appear to have hair that is separated by braids or very short dreads, their styles are all very close to the head. Only Frazier's dreadlocks stand out from his head, reaching his eyes in the front and his shirt collar in the back, exactly in the alternating length manner that Zakkour described. Moreover, the police did not give the participants hats, which might have minimized the suggestiveness of the lineup. *Compare, People v. Moore,* 143 A.D.2d at 1056, 533 N.Y.S.2d 602 (lineup suppressed where defendant only participant with braids and police could have easily, but chose not to, ask participants to wear hats); *with People v. Walker,* 215 A.D.2d 606, 626 N.Y.S.2d 843 (2d Dep't) (lineup not unduly suggestive where defendant's only distinctive characteristic was hairstyle and participants all wore hats).

Despite the impermissibly suggestive nature of the lineup, the admission of Zakkour's in-court identification was not error because there was a sufficient basis for the trial court to determine that the identification had independent reliability. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *United States v. Kwong,* 69 F.3d 663 (2d Cir.1995), *cert. denied,* 517 U.S. 1115, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996). The factors to be considered in determining whether identification testimony is independently reliable include, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation and the time between the crime and the confrontation." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). These factors must be assessed in light of "the corrupting effect of the suggestive lineup itself." *Manson v. Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243. Applying this test to these

facts presents a close case, but granting due deference to the trial court's factual findings, the court's conclusion was not unreasonable.

In order to grant habeas relief, a district court must determine that the state court's ruling either, (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. In *Raheem*, discussed above, the Second Circuit did not make a clear distinction between the *de novo* application of the *Neil v. Biggers* factors on the one hand, and the evaluation of whether the state trial court erred in its application of those factors on the other hand.

In that case, the Second Circuit approved of the District Court's application of the *Neil v. Biggers* factors, and its determination that there was not sufficient independent reliability to admit the in-court identification, despite the fact that the state trial court made a finding that the lineup was not suggestive and the New York Court of Appeals determined that "the lower court's determination that the lineup was not suggestive involves a mixed question of law and fact which is supported by the record and is thus beyond review in this court." *People v. Whitaker*, 64 N.Y.2d 347, 351 n. *, 486 N.Y.S.2d 895, 897 n. *, 476 N.E.2d 294 (1985). Furthermore, the Appellate Division found on the appeal of Raheem's first trial that even "assuming the identification of [Raheem] at the lineup should be suppressed because he was compelled to participate in it, the in-court identification of [him] had a sufficient independent origin." *People v. Whitaker*, 75 A.D.2d 111, 125, 428 N.Y.S.2d 691, 700 (2d Dep't 1980).

Thus, there were holdings by the state trial court that the lineup was not suggestive, by the Appellate Division that there was sufficient independent basis for the identification, and by the Court of Appeals that the finding was partly factual and thus not reviewable. Nonetheless, the Second Circuit applied the *Neil v. Biggers* factors to the facts before it, finding as the district court did, that there was insufficient independent reliability to permit an in-court identification.

Viewing the finding of the trial court in light of the *Neil v. Biggers* factors, there was sufficient evidence presented to support the state court's finding that the in-court identification of Frazier had sufficient reliability, independent of the lineup. First, there was evidence that Zakkour had a clear opportunity to view the robber at the time of the crime. The crime occurred during daylight hours and Zakkour testified that the perpetrator's face was approximately an arms length away from her at one point. Zakkour also testified that when she was on the ground, she could see her attacker's face and the intense expression in his eyes. Moreover, she testified that the crime lasted about two to three minutes, during which time, Zakkour says she continued to stare at her attacker's face. She also testified that she did not lose focus and maintained her composure during the encounter. Further, the time between the crime and the pretrial identification was nine days, which is not an unduly lengthy period of time. When Zakkour viewed the lineup, she immediately identified Frazier and there were no discrepancies between her initial description and Frazier's actual appearance. As noted above, Zakkour consistently described her assailant as, "a male black, approximately twenty to thirty years old, six feet tall, thin, but muscular, [with] facial hair and alternating dread-

locks ... the longest one being sort of chin to shoulder length."

Thus, there was evidence presented that Zakkour had a close-range, unobstructed view and gave a detailed and accurate description of her assailant. Unless Frazier proves otherwise by clear and convincing evidence, a federal habeas court must presume a state courts finding of fact to be correct. *See* 28 U.S.C. § 2254(e)(1). Having made no such showing, the claim must fail.

■ Frazier also contends that the trial court's refusal to permit the defense from challenging the prosecution's case by refusing to permit the defense to call witnesses at the *Wade* hearing entitles him to relief. After the prosecution rested, counsel sought to call Detective Mami, Sergeant Moran, and Officers Fee and Kosinski to testify about inconsistencies in various descriptions of the suspect and the manner in which the incident occurred that Zakkour gave to the police during the investigation. Frazier contends that Zakkour's inability to provide consistent information about the suspect's appearance to the police at various points during the investigation would have been relevant to the core issue of the hearing: whether Zakkour was able to accurately remember the appearance of the man, separate from the taint created by the lineup.

Mami's testimony also would have been relevant to the ultimate issue because two of her reports indicated that, shortly after the incident, Zakkour said she did not believe she could identify the man who robbed her. Furthermore, since Zakkour specifically denied making this statement, counsel properly laid the foundation to permit Mami to testify as to Zakkour's prior inconsistent statement. Similarly, since Zakkour denied telling Fee that she was walking down a path, rather than sitting on a bench, when she was hit from

behind, Frazier contends Fee should have been permitted to testify that, in fact, that is what Zakkour told her. This information would also have been relevant to the issue of independent source, because it helps to establish that Zakkour was confused about the crime, which would affect the reliability of her claim that Frazier was the man who committed it.

The trial court did not allow the witnesses to be called, because their testimony would have been "duplicative" to what was already in evidence, referring to Fee's report which was already in evidence, and in light of counsel's representation that additional evidence, relevant to independent source, would be provided by the witness. Frazier contends that his attorney should have been able to ask Fee, who spoke to Zakkour at the hospital shortly after the incident, about Zakkour's condition during the conversation. Questions about Zakkour's condition and her statements made at the hospital would also have been directed at Moran and Kosinsky.

■ The evidence sought here was relevant to the issue before the court. However, failure to admit this evidence does not rise to the level of Constitutional error because it constitutes harmless error. An error is not harmless if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (internal quotation marks omitted). The principle factors to be considered in the determination of whether the erroneous admission of evidence was harmless are "the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." *Wray v. Johnson,* 202 F.3d 515, 526. In assessing importance, a court should consider "whether that testimony was material to the establishment of

a material fact or whether it was instead corroborated and cumulative." *Id.* Here, the evidence at issue was in the context of a *Wade* hearing before the Court and not the jury. Further, the evidence was relevant to the independent reliability of Zakkour's in-court identification which was already called into question by the reports which conflicted with Zakkour's testimony. The failure to permit counsel to call additional witnesses at the *Wade* hearing is thus harmless error.

On these facts, the state court's decision that Zakkour's in-court identification was reliable independent of the pretrial lineup is not inconsistent with the Supreme Court's ruling in both *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. 375, and *Manson v. Brathwaite,* 432 U.S. at 98, 97 S.Ct. 2243. The decision was not contrary to or an unreasonable application of Federal law as determined by the Supreme Court.

### The Trial Court Properly Granted the Prosecutor's Batson Objection to a Defense Peremptory Challenge

■■■■ Frazier contends that the trial court improperly rejected his race-neutral explanation for exercising a peremptory challenge against an Asian–American juror and erroneously denied him a peremptory challenge against that juror thereby depriving him of due process. However, Frazier has failed to demonstrate that his case satisfies either condition set by § 2254(d)(1) of the AEDPA. The state court's decisions were not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

In *Batson,* the court set forth a three-step process for determining whether a party is exercising peremptory challenges in a manner that violates the Equal Protection Clause. First, a trial court must

decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race. Such a *prima facie* case may be established, for example, by showing a pattern of strikes against a cognizable group. *Id.* at 97, 106 S.Ct. 1712. If the party making the *Batson* challenge establishes a *prima facie* case, the trial court must require the non-moving party or the party whose peremptory challenges are being examined, to proffer a race-neutral explanation for striking the potential juror. *Id.* at 97, 106 S.Ct. 1712. This second step does not require the non-moving party to give an explanation that is persuasive or even plausible. *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Finally, if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the party questioning the peremptory challenge has carried his or her burden of proving that the strike was motivated by purposeful discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. This third step of the *Batson* inquiry, requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances and it is only here that the persuasiveness of the race-neutral explanation is relevant. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

During the first round of the jury selection process in this case, the defense peremptorily challenged five prospective jurors, two of whom, Ms. Weizhi Lu and Mr. Chuck Ma, were the only Asian–Americans on the initial panel of twelve individuals. (Tr. 117–118). The prosecutor raised a *Batson* claim, alleging that defense counsel was eliminating all potential Asian–American jurors. The trial court ruled that the prosecution had made the requisite *prima*

*facie* showing of discrimination, and directed the defense to come forward with a race-neutral explanation. Defense counsel then proffered reasons for striking the two prospective Asian-american jurors.

After the defense counsel explained his reasons for exercising the two peremptory challenges, the prosecutor objected, arguing that defense counsel's assertions were unsupported by the record and that counsel never posed a question directly to either juror. The trial court, however, responded that defense counsel had satisfied his burden of articulating race-neutral reasons for the disputed challenges as required by the second stage of the *Batson* analysis, and that it would move to the third stage inquiry of whether the proffered reason was pretextual. The trial court asked the prosecutor to address the reasons why defense counsel's race-neutral explanation for the two challenges should be viewed as pretextual. The prosecutor reiterated his argument that there was no support in the record for the conduct complained of by the defense. During *voir dire,* defense counsel never specifically questioned Ms. Lu about her ability to be impartial and neither Ms. Lu nor Mr. Ma employed body language that was significantly distinguishable from that of other prospective jurors. The prosecutor further argued that defense counsel's proffer was "speculative," and based on a "whim" rather than "hard data." According to the prosecutor, defense counsel's real reasons for striking the two Asian–American jurors was a general perception that "Asians for the most part are most likely to tend toward convicting a defendant than other groups." The court then reviewed the *voir dire* record with the parties.

The trial court ruled that defense counsel's race-neutral reasons for striking Mr. Ma were satisfactory. However, as to the defense challenge of Ms. Lu, the court found that the defendant's reasons for striking her were pretextual. The court also stated that defense counsel had treated Ms. Lu differently from other jurors and that the challenge was "purely intuitive." Accordingly, the trial court ordered that Ms. Lu be seated as juror number one.

On appeal, the Appellate Division, First Department, affirmed the trial court's *Batson* ruling. The appellate court found that the trial judge properly followed the three-step *Batson* analysis. Specifically, the appellate court stated:

> The [trial] court's determination that defendant's race-neutral reason for challenging the prospective juror was pretextual is entitled to great deference on appeal, particularly since the proffered reason was demeanor-based, and since the totality of the *Batson* ruling establishes that in making its determination the [trial] court employed its unique opportunity to view the venire person's actual demeanor. In rejecting defense counsel's reason, the [trial] court implicitly rejected the claim for which there is no record support, that the juror was inattentive.

*See People v. Fraser,* 271 A.D.2d 205, 706 N.Y.S.2d 38 (1st Dep't.2000).

The state court's adjudication of Frazier's *Batson* claim is consistent with federal law as determined by the United States Supreme Court in *Batson* and its progeny. After the prosecutor raised the *Batson* challenge, and sufficiently set forth a *prima facie* case of racial discrimination, the trial court required the defense counsel to offer race-neutral explanations for each of the challenged peremptory strikes. When the prosecutor challenged the validity of the defense proffer, the trial court correctly noted that the second step of the *Batson* analysis does not demand an explanation that is persuasive or even plausible. The

trial court found that the defense proffer was facially valid and proceeded to the final step of deciding whether the prosecution proved purposeful racial discrimination in the defense pattern of peremptory strikes. After careful consideration of the applicable case law and argument of the parties, the trial court credited the defense race-neutral explanation as to Mr. Ma, but rejected the defense rational for striking Ms. Lu, explicitly stating that the proffer was pretextual.

In addition, the standard of review applied by the appellate court in reaching its determination that the trial court properly granted the prosecution's *Batson* objection to the defense peremptory challenge, is also consistent with the United States Supreme Court rulings. In *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769 (1995), the Court held that a state trial court's decision on the ultimate question of discriminatory intent, represents a finding of fact of the sort accorded great deference by a reviewing court, particularly in cases where the trial judge's findings "largely turn on evaluations of credibility." *See also Batson, supra,* at 98, 106 S.Ct. 1712; *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). This rule is especially applicable in the instant case because defense counsel's race-neutral proffer involved matters which the trial court had a unique opportunity to observe, namely, whether the challenged juror was inattentive or lacked proper demeanor.

Pursuant to 28 U.S.C. § 2254(d)(8), in *habeas corpus* proceedings in federal court, the factual findings of state courts are presumed to be correct, and may not be set aside, absent procedural error, only if they are "not fairly supported by the record." *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Here, the appellate court properly

concluded that the state court's rejection of the defense proffer was fully supported by the record. There was no indication that juror Lu was inattentive or that her demeanor differed greatly from that of others on the panel.

### Petitioner's Excessive Sentence Claim Does Not Present a Federal Constitutional Issue. The Sentence Imposed By the Judge Was Appropriate and Within the Range Prescribed by State Law

██ Upon his conviction for Robbery in the First Degree under New York Penal Law § 160.15(3) and Robbery in the Second Degree under New York Penal Law § 160.10(2)(a), Frazier was sentenced to serve a concurrent term of twenty and ten years respectively, in the New York State Penitentiary. The sentencing judge imposed this sentence based on a finding that aggravating factors were present, namely, Frazier's commission of the crimes in an especially heinous and cruel manner, his lack of remorse and belligerent attitude during the sentencing colloquy, and his criminal history which includes a prior felony conviction for Attempted Robbery in the Third Degree committed in 1993 that also involved a female victim from whom Frazier demanded money and pushed against the wall. In addition, the presentence report indicated that Frazier refused to cooperate in his presentence interview with the probation department.

██ In both his habeas petition and appellate brief, Frazier argues that the sentencing judge abused his discretion by placing undue emphasis on improper factors such as his lack of remorse. According to Frazier, the sentence imposed was unnecessarily harsh and excessive because the sentencing judge sought to penalize him for maintaining an innocence claim and for exercising his right to proceed to trial rather than accept a plea offer made by the prosecution which included a five-

year prison term. Frazier has failed to show that his sentence violates the Eighth Amendment prohibition on cruel and unusual punishment. The Eighth Amendment forbids only extreme sentences which are "grossly disproportionate to the crime." *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). A sentence of imprisonment that is within the limits of a valid state statute ordinarily is not cruel and unusual punishment in the constitutional sense. *White v. Keane,* 969 F.2d 1381 (2d Cir.1992); *Underwood v. Kelly,* 692 F.Supp. 146 (E.D.N.Y.1988), *aff'd,* 875 F.2d 857 (2d Cir. 1989); *U.S. v. Santos,* 64 F.3d 41 (2d Cir. 1995). As a second felony offender under New York State law, Frazier was subject to a twenty-five year period of imprisonment. New York Penal Law § 70.06(3)(b). Therefore, Frazier's twenty-year term of imprisonment within the range of years prescribed by law.

 Nor is Frazier's claim that the judge abused his discretion by relying on Frazier's lack of remorse a cognizable constitutional issue for federal *habeas* relief. The judge's reliance on Frazier's lack of remorse as a contributing factor in the imposition of the sentence herein, was not "so arbitrary and capricious as to constitute an Eighth Amendment violation." *Richmond v. Lewis,* 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). And, as acknowledged by Frazier in his appellate brief, the judge did not focus on his lack of remorse alone. The judge also discussed the heinous nature of the crime and the brutality of the assault inflicted upon the victim by Frazier. In addition, because of Frazier's prior record of an attempted robbery which also involved a female victim, his present offense was rendered more severe by the sentencing judge and justified the imposition of the sentence complained of. Contrary to Frazier's asser-

tions, the judge did not impose the twenty-year sentence based on Frazier's refusal of the prosecutor's plea offer and desire to proceed to trial. In fact, the judge specifically stated that he did not "find fault with Petitioner's innocence claim," and acknowledged that it was Frazier's "right" to maintain his innocence.

As such, Frazier's sentencing claim does not present a federal constitutional issue and habeas relief is not available. The sentencing judge did not abuse his discretion and the sentence imposed was within the range of years prescribed by state law.

For the reasons stated, Frazier's petition is denied. A certificate of appealability will be issued.

It is so ordered.